## GLOBE GRAIN & MILLING CO. v. INDUSTRIAL COMMISSION et al.

No. 6050.  Decided June 20, 1939.  (91 P. 2d 512.)

Rehearing denied January 29, 1940.

For opinion on rehearing see 98 Utah 48, 97 Pac. 2d 582.

*DeVine, Howell & Stine* and *Neil R. Olmstead,* all of Ogden, for plaintiff.

*Joseph Chez,* Atty. Gen., and *A. N. Ferro,* of Salt Lake City, for defendants.

WOLFE, Justice.

Albert E. Thomas made application for unemployment benefits under what is called the Unemployment Compensation Law (Chapter 1, Laws of Utah 1936, Special Session, as amended by Chapter 43, Laws of Utah 1937). The special deputy charged with investigating and auditing the claim held that Thomas was not entitled to compensation. The appeal tribunal to which the deputy's findings were taken held that Thomas was entitled to compensation. The Industrial Commission refused to permit an appeal from the appeal tribunal. This action of the commission, treated by petitioner herein as a confirmation of the findings of the appeal tribunal, is brought to this court for review. No questions of correct procedure are raised and we raise none. The only question to be decided is: Was Thomas in the employ of petitioner as defined by the act so as to be entitled to share in the Unemployment Compensation Fund?

The Globe Grain and Milling Company claims he was excluded as a beneficiary because the concurrence of three tests for exclusion, hereinunder set out, took him out of the status of employment which is the foundation of a claim for benefits under the act.

Section 19 (j) (5) of the act reads as follows:

"Services performed by an individual for wages shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the commission that—

"(a) such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and

"(b) such service is either outside the usual course of the business for which such service is performed or that such service is performed

outside of all the places of business of the enterprise for which such service is performed; and

"(c) such individual is customarily engaged in an independently established trade, occupation, profession or business."

There was no question but that Thomas performed services for the petitioner and that he received "wages" as wages are defined by Section 19 (p) of the act. Section 19 is a section on definitions and provides a glossary which pertains to the act. These definitions may differ from the common law concepts designated by the same words. The above quoted Section 19 (j) (5) signifies a relationship entitled to benefits of the act beyond that of a mere master and servant relationship.

The idea of independent contractor grew out of the realization that one who engaged a contractor to build a structure or a chattel according to specifications and turn over the completed job for a named price without in any way controlling the means or methods of fulfilling the contract should not be subject to the rule of respondeat superior (Holmes, The Common Law, 231 et seq.; Holmes, History of Agency, Vol. 3 of Select Essays in Anglo American Legal History, 405), a tort principle which made negligence of a servant committed in pursuance of his employment the negligence of the master. That was on the theory that the negligent act of the servant done in pursuance of the master's business was in contemplation of law the act of the master. *Fox* v. *Lavender*, 89 Utah 115, 56 P. 2d 1049, 109 A. L. R. 105. This principle was held not applicable to the independent contractor. But the principle on which the independent contractor was differentiated from the servant, i. e., freedom from control in methods and means, later was used to make what in reality was a servant an independent contractor in form. An old servant who knew his master's wants and desires as to how things should be done might be made an independent contractor in legal form. A negro cotton picker could be given the aspect of an independent contractor. In such cases the principle of

respondeat superior might still apply. Certainly such relationships could be made subject to unemployment compensation benefits. Such was the purpose of requiring all of paragraphs (a), (b), and (c) to be proved before the applicant could be denied the benefit of the act.

The most independent of independent contractors therefore are not included in the class of individuals entitled to benefits, but a class of individuals, who under strict common law concept of independent contractorship were other than employees, are entitled we need not draw the line. It is drawn for us by the act. Cases appearing since this opinion was written but before publication hereof which treat of this aspect of the case are: *Industrial Commission* v. *North Western Mutual Life Ins. Co.*, Colo., 88 P. 2d 560; *Unemployment Compensation Comm.* v. *Jefferson Standard Life Ins. Co.*, 215 N. C. 479, 2 S. E. 2d 584. In the case of *North Western Mutual Life Ins. Co.* v. *Tone*, 125 Conn. 183, 4 A. 2d 640, the statute expressly restricted the benefits to the relationship' of master and servant.

The Commission in this case held that the employer prevailed in his proof of the (b) factor but not as to the (a) and (c) factors. Thomas had his office in the Cullen Hotel in Salt Lake City, and his services were performed by soliciting customers to buy pellets made by petitioner which service was performed outside and away from all the places of business of petitioner. Our task is to determine whether the evidence was such as to show that the commission was arbitrary or unreasonable in not finding that Thomas had been, at the time of his disseverance from petitioner's service, free from control; and also whether it had been arbitrary or unreasonable in not finding that he was customarily engaged in an independently established trade, occupation, profession or business. Unless the tests, (a), (b), and (c), all concurred he would not be excluded from the status of employment as defined by the act and would, so far as such employment was concerned, be entitled to benefits under the act.

There is some doubt as to whether or not the appeal tribunal was correct in holding that the evidence did not satisfactorily show that Thomas had been free from control in the performance of his services. The fact that the contract was one of continuous and current bilateral execution and could be terminated by either side at any time carries with it such potentialities for indirect control of performance as, coupled with other facts, may present a basis for argument that the appeal tribunal was correct in that finding. But it is unnecessary to determine that question because we have concluded that the evidence sustains the commission (appeal tribunal) in its finding that test (c) above has not been fulfilled and hence Thomas was not excluded from the cognizance of the commission as a beneficiary of the fund, at least so far as requirement of "employment" as defined by the act was concerned.

We now set out the evidence from which we conclude that the commission was not required in law to be convinced that Thomas was customarily engaged in an independently established business at any time during his incumbency with petitioner, and especially at the time his services terminated.

The material facts involved in this controversy are these: Some four or five years before the hearing in April, 1938, Albert E. Thomas met F. E. Clark, then occupying a managerial position with the Globe Grain and Milling Company, they entered into an arrangement whereby Mr. Thomas was to undertake to sell certain prepared sheep feed, referred to in the record as pellets, he to receive one dollar per ton for all pellets sold by him for the company. The company supplied Mr. Thomas with business cards, stationery, company order books, samples, and stamps, and paid the expense of telephone calls by him to the Ogden office. For a period of about three months he was permitted to use an automobile belonging to the company. Thereafter no such transportation was furnished.

The arrangement having been entered into, Thomas engaged a room at the Cullen Hotel. This hotel is generally

recognized as a sort of headquarters for sheep and cattle men. There samples of feed were kept by Thomas for exhibition and for inspection by prospective purchasers. Thomas was to pay, and did pay, for his room and all other expenses. He was not required to operate from any particular place. In 1937 he moved to another hotel.

Advances were at times made to him upon orders submitted but not collected for when the purchaser's credit was regarded as good. The company fixed the price at which the pellets were to be sold and all sales made on credit were subject to approval by the company. Orders were taken on company order forms. Sales and shipments were direct to the pruchaser from the company plant at Ogden, Utah. Thomas was restricted as to the territory in which he was permitted to operate. During the early part of his connection with the company he was assisted in making contacts and in his sales endeavors by a salaried representative of the company. There was no requirement as to the number of hours or the portion of the day he should work. On a number of occasions Thomas was requested by the company to, and did, contact individuals to whom he had made sales to urge payment of over due accounts. The arrangement between Thomas and the company could be terminated at the will of either party.

The pellets are a winter feed and the selling period therefor was limited, extending from September to April. Thomas, however, had no employment during the other months of the year.

Prior to his described connection with the Globe Grain and Milling Company Thomas had been in the insurance business in southern and eastern Utah. He had given up this business a short time before his contract with Clark and had moved to Salt Lake City. He sold no insurance during the time he worked for the company and testified that he made no effort to do so. The only business he did during the entire period, other than that done for the company, was the selling in 1938 of a car of corn for a party in Nebraska

for which he received a commission, and the referring to one Maxfield, a dealer or broker in feed, of customers to whom he was himself unable to sell. For this latter service Maxfield paid him forty dollars. One witness testified that during the early part of 1938 Thomas told him he was attempting to sell a little insurance because the pellet selling business was poor.

Under this evidence we do not think it unreasonable for the commission to have found that the (c) portion of the exclusion section was not established. Since Thomas is not excluded by a combination of (a), (b), and (c), he is, so far as employment is concerned, entitled to the benefits of the act. He is not excluded if there is a failure to establish any one of (a), (b), (c).

Petitioner contends that a holding as above makes the act unconstitutional as contravening fundamental law as contained in Article I, Section 7 (due process clause), Article I, Section 18, (against impairing the obligations of contract), Article VI, Section 23 (prohibiting a bill from containing more than one subject) of our State Constitution and Article I, Section X (impairing obligations of contract) and the Fourteenth Amendment of the Federal Constitution, U. S. C. A. This formidable array of assertions of constitutionality is not supported by the citation of any authorities. If the contention that the act did not clearly express in its title the subject is good, the act is unconstitutional regardless of whether we affirm or reverse the commission's findings. But the title does not offend in that regard. The subject in regard to which the legislation pertains has been "clearly expressed in the title." The subject is "Unemployment Compensation." The constitutional provision does not require that all the methods prescribed in the act for carrying out its objects be reflected in the title, nor all the classes affected by the act. There may be compensation for some types of unemployed independent contractors, as known in the common law concept, provided for

in the act, which would be covered by the subject "Unemployment Compensation."

Does the act, if construed to cover Thomas, whose relationship with petitioner was created and continued for a considerable period before the act was passed, impair the contract between petitioner and Thomas. We think it does not. Nor do we think it violates the due process clause of either our State or Federal Constitution.

In the case of *Carmichael* v. *Southern Coal & Coke Co.*, 301 U. S. 495, 57 S. Ct. 868, 81 L. Ed. 1245, 109 A. L. R. 1327, it was held that the contributions required from the employers were a tax and as such were conveyed into a fund. The fact that the tax imposed on employers was not used for purposes immediately related to the employer's business or only for the benefit of his employees, but became part of a fund out of which benefits were paid to a class of employees of many employers who also contributed to the fund, did not make the law unconstitutional. Seldom are collected taxes spent in such a way as to return to each taxpayer special, material benefits, to say nothing of benefits commensurate with or equivalent to the taxes paid. Taxes are not paid on the theory that a special quid pro quo, measured in value by the amount of the tax paid, shall be returned to each taxpayer in the form of a special benefit to him. It is not like services or merchandise purchased. It is sufficient if the taxes are devoted to a public purpose. The taxpayer as a part of the public gets his return in the public services rendered with his taxes. The expenditure of taxes for unemployment relief is a public purpose. *Carmichael* v. *Southern Coal & Coke Co.*, supra. *New York Rapid Transit Corporation* v. *New York,* 303 U. S. 573, 586, 58 S. Ct. 721, 82 L. Ed. 1024, 1034; *Cincinnati Soap Co.* v. *United States,* 301 U. S. 308, 313, 57 S. Ct. 764, 81 L. Ed. 1122, 1128. If the tax theory is correct, petitioner was paying a tax on the right to contract. It matters not whether the subject on which the tax was incident was a contract in the nature of master and servant or went further and included

some independent contractors as measured by common law concepts. The choice of subjects for the imposition of an excise or privilege tax is within the choice of the legislature up to the point of arbitrary classification. Hence, no question of the impairment of contract is involved. The contract is not impaired; it goes on as before. The relationship created by the contract is taxed. And if, as before stated, this tax money is spent for public purposes, the requirements of due process have been fulfilled. Parenthetically, it would seem that the employer class was in this act obtaining a benefit of the moneys contributed as taxes somewhat more immediate than most taxpayers who pay taxes. It was for the benefit of a class who were called upon to perform services for them. The public generally has an interest in sustaining morale and maintaining this class when unemployed, but certainly the employer class which must call on that class again for services has a more special, immediate and material interest than has the rest of the general public.

Even on the theory that the unemployment compensation was attained not through an exercise of the taxing power but by the police power, the legislation may be upheld as due process. It has its similarities and dissimilarities with workmen's compensation which was upheld on that theory, but we think that the dissimilarities are not such as would make the analogy in this regard inapplicable. As a matter of fact, when the employer is compelled to insure his compensation risks under workmen's compensation by paying premiums to insurance companies, he by payment of his premiums creates the fund out of which disability compensation is paid. And it is not a denial of due process that there is returned from the fund to his disabled employees more or less than he has put into the fund. It has been so held. In workmen's compensation, his premium rates depend on his experience rating. There is no essential difference in the fundamental theory of unemployment compensation. The employer, instead of paying a percentage of his payrolls to a corporate insurance company or the state fund, here pays

a percentage to another fund. Instead of paying for a disability occurring in the course of or arising out of the employment this fund pays a benefit for unemployment which arises out of the employment. And under this act his premium rates will depend upon experience. It is true that a disability from an injury is directly connected with the industry while a disability because of inability to get a job may have mediate causes outside the industry. Both workmen's compensation and unemployment compensation as enacted in this state, may we think, be sustained as proper exercises of the police power, not to be restrained by the due process clause.

From what has been said above we have found it unnecessary to consider whether a contract which is currently performed bilaterally and which may be terminated by either party at any time without cause is a contract which could be impaired by the act under consideration. Since it may be terminated at any time with full execution by both sides up to that time, any "rough going" may be the occasion of terminating it. Whether under such circumstances a contract may be impaired, we need not say.

The findings of the appeal tribunal as confirmed by the Industrial Commission by reason of its refusal to permit an appeal, are affirmed.

McDONOUGH and PRATT, JJ., concur.

MOFFAT, Chief Justice (dissenting).

I dissent. The record discloses that the Industrial Commission refused to permit an appeal and without an examination of the record affirmed the decision of the appeal tribunal. This is not due process of law under the statute. This matter is ignored by the prevailing opinion.

The prevailing opinion interpreting the statute says that it "signified a relationship entitled to benefits of the act beyond that of a mere master and servant" and indicates that the statute does not include "the most independent of

independent contractors" and then states: "We need not draw the line. It is drawn for us by the act."

The line apparently drawn by the opinion interpreting the act is one of inclusion making the line a circle encompassing all contractual relations. Thomas, while selling on commission for the Globe Grain and Milling Company, also sold "a car of corn for a party in Nebraska for which he received a commission" and "was attempting to sell a little insurance because the pellet selling business was poor." Is the Globe Grain and Milling Company responsible for the success of Thomas' commission business? If so, then may a contract be made with another where the purchaser of an accomplishment is not dependent on the efficiency of the other so as not to be within the statute, under the construction made by the prevailing opinion?

This suggests the plight of the Irishman who was called upon to define the word "exit" and not being able to otherwise do so concluded that it was an "entrance out." We find nothing in the opinion to differentiate between an "independent contractor" and the "most independent of independent contractors." There is no "entrance out." So interpreted, the constitutionality of the statute may be questioned.

LARSON, Justice.

I concur in the views expressed by Mr. Chief Justice MOFFAT in his dissenting opinion.