IN RE ZEITS

[No. 16,735.   Filed January 23, 1941.]

618

*Arnold, Chipman & Degnan,* of South Bend, for appellant.

*Samuel Jackson,* Attorney General; *Joseph P. McNamara,* Deputy Attorney General; and *Charles W. Grubb,* Attorney for Compensation Division, for appellee.

BLESSING, J.—Under the provisions of the Unemployment Compensation Act of 1937 (Acts 1937, p. 705, Sec. 7, (1) (m), Acts 1939, p. 585, Sec. 6, (1) (m)) the Review Board has certified six questions of law based upon the following facts:

"The applicant, Dallas Zeits, filed a claim for unemployment compensation on January 25, 1940, claiming wage credits upon earnings from the Plymouth Manufacturing Company. The employer, the Plymouth Manufacturing Company, contends that the services of Zeits did not constitute employment within the meaning of the Indiana Unemployment Compensation Law because Zeits was a partner and not an employee. Zeits performed services as an alleged partner from October, 1938, until July 10, 1939, at which time his services were terminated. Upon protest of payment by the employer, the claim was referred to the Appeal Tribunal and then transferred to the Review Board upon motion of that body. Evidence was submitted by both parties and the following facts concerning the status of Zeits and others similarly situated were found:

"A. The Plymouth Manufacturing Corporation owned and operated a plant for manufacturing boxes and crates at Plymouth, Indiana. Its officers were Sam Tomlinson, President, and Hubert Tanner, Secretary, and its Board of Directors included said Tanner, William H. Wolfarth, George E. Warren and Chester M. Thompson. On or about the 10th day of October, 1938, the corporation, by its proper officers and with the approval of its Board of Directors, entered into a written lease of its real estate, plant buildings thereon situate and its machinery and equipment, tools, motors, boilers, etc., to the aforementioned Hubert Tanner, William H. Wolfarth, George E. Warren and Chester M. Thompson, and transferred to them its stock of materials and inventory, together with all orders on hand. Such lease was from month to month subject to termination by either party upon notice of thirty days and gave the lessor, as part of the rental consideration, 70% of the net profits from the operation of the bus-

iness. Under date of October 22, 1938, the lessees formed a purported partnership agreement in writing with all the workers of the plant which designated the four lessees, who were directors of the Plymouth Manufacturing Corporation, as Senior Partners and all other plant workers as Junior Partners in a firm which became the Lessee in a written sub-lease of all the aforementioned property of the Plymouth Manufacturing Corporation which had been so leased to such Senior Partners. The original lease was not assigned to the new firm but a new lease was entered into. This partnership agreement was recorded in Marshall County. The new firm was designated as 'Plymouth Manufacturing Company.' It was testified that group meetings of workers, including Zeits, were held in which the terms of the new agreement were explained and each was then asked to sign the agreement as a Junior Partner and it was made known that those who refused to sign would not be furnished with further work. Zeits testified that he was called to the offices in company of two other workers and was told by a Senior Partner that they wanted 100% response from the workers and that although they did not have to sign the agreement there would be no more work for those who did not. Zeits thereupon signed the agreement as a Junior Partner and approximately 113 others did likewise but signed at different times and places. Under the agreement all of the business management was vested in the four Senior Partners. One of these, Thompson, had been Superintendent and actually continued in substantially the same capacity. All alleged Junior Partners who worked a minimum of 600 hours in any year were to receive a proportionate share of 10% of the net profits of the lessee based upon 'units of interest.' These units represented hours of work and

each Junior Partner's share was to be in ratio to his hours worked. A Junior Partner could be expelled or could resign, but was entitled to no further interest as a partner thereafter, nor was he entitled to any final distribution of assets, in the event of liquidation or termination of the partnership, except as to the 10% of profits allocated to Junior Partners. A partner's interest and his relation to the business as such existed only while he continued to perform services. No investment of capital was made by any Junior Partner and all hours of work contributed were compensated at a fixed hourly rate. The Superintendent had authority to assign the Junior Partners to their respective positions, supervise the same, and fixed their hourly rates of payment for services. New Junior Partners could be added to the partnership by the Senior Partners and old ones could be dismissed all without notice or consent of other Junior Partners. In the event of termination of the lease all inventory and other liquid assets reverted to the Plymouth Manufacturing Corporation. There is no evidence that, under the partnership articles, the status and duties of a Junior Partner were any different than he formerly enjoyed as an employee of the retiring corporation during the period of plant operation.

"B. It was further disclosed that, under date of November 7, 1939, amendments in writing were made to the original articles of partnership. Under these amendments all distinction between Junior and Senior Partners was abolished, save as to drawing accounts and division of profits for the Senior Partners. It provided that thereafter the affairs of the partnership should be managed by a Board of Control of six persons with each of the four former Senior Partners named by the amendments as a member of such Board and the Board further augmented by two representatives

chosen by a majority vote of the former Junior Partners, one from the mill and one from the East end of the plant. The members were thereafter to be elected semi-annually. The Board of Control was to exercise all powers of management exercised previously by the Senior Partners. The amendment further provided that no partner could voluntarily sever relations excepting after 30 days' notice in writing to the Board of Control. It also prevented any partner from selling, assigning or transferring his interest without the unanimous consent of the Board of Control."

The questions certified are as follows:

(1) "Whether or not the Plymouth Manufacturing Company was a partnership prior to November 7, 1939, and, if so, who were its members?"

(2) "Whether or not the Plymouth Manufacturing Company was a partnership on and after November 7, 1939, and, if so, who were its members?"

(3) "Whether, prior to November 7, 1939, the employing unit doing business in the name and style of Plymouth Manufacturing Company was an employer subject to contribution under the Indiana Unemployment Compensation Law?"

(4) "Whether, on and after November 7, 1939, the employing unit doing business in the name and style of Plymouth Manufacturing Company has been and now is an employer subject to contribution under the Indiana Unemployment Compensation Law?"

(5) "Whether the services performed by the claimant Zeits for the Plymouth Manufacturing Company constituted 'employment' within the meaning of Section 2 (h) (5) of the Indiana Unemployment Compensation Law?"

(6) "The period of time, if any, for which Zeits is

entitled to claim wage credits for services performed for the Plymouth Manufacturing Company?"

The Plymouth Manufacturing Company and the Unemployment Compensation Board have both submitted briefs on the questions involved in this case.

In the brief of the Plymouth Manufacturing Company, counsel set out as an appendix to their original brief certain exhibits including the articles of agreement signed by Dallas Zeits, whose claim for unemployment compensation gives rise to the certified questions of law.

Since both parties submitting briefs refer to this contract, the court in this particular case will consider it as one of the facts in determining the status of the claimant.

The paragraphs of said articles of agreement bearing especially upon the questions at issue are as follows:

(1) "The said senior partners have leased from the Plymouth Manufacturing Corporation, a corporation organized under the laws of the state of Indiana, with its office and place of business in Plymouth, Marshall County, Indiana, all of the real estate and tangible personal property of said corporation, all as provided by a written lease from said corporation to said Senior Partners dated October 10, 1938, which lease, by reference is incorporated herein. Said senior partners, by this instrument, sublet said premises and property unto this partnership, from month to month, beginning October 22, 1938, to continue on such month to month basis, unless this sublease is sooner terminated, either by agreement of the parties, or by a declaration of termination for a breach of any of the covenants of said lease, or by reason of the termination of the said lease between the senior partners and the corporation aforesaid. This partnership hereby assumes and agrees

to carry out and perform all of the promises and agreements undertaken on the part of the senior partners as contained in said lease from said corporation to said senior partners."

(2) "The senior partners will, at all times, have general charge and control of the property hereby sublet to this partnership, and all other property which it may in the future acquire. The partnership shall carry on the manufacture of wire-bound boxes and such other lines of products as the senior partners shall direct. Said senior partners shall direct the work to be done by the junior partners on said premises, and if any unlawful, unworkmanlike practice or conduct of disloyalty to the firm, or non-conformity with any provision of these Articles of Partnership is done or suffered to be carried on by a partner within or on said premises or in relation to the firm business, said senior partners may, at their option and by their unanimous consent, forthwith terminate this sub-lease and this partnership agreement, as to such offending member of the firm and to exclude such offender from said premises. This covenant is deemed as of the essence of this sublease and partnership agreement to protect the other persons who are now or in the future may become partners and sub-lessees and who would or might suffer irreparable injury by such breach of partnership duty."

(3) "The senior partners, and all others who subscribe with them these articles of partnership, (whether contemporaneously, or from time to time hereafter) shall be and constitute a partnership doing business under the firm name and style of PLYMOUTH MANUFACTURING COMPANY. The withdrawal by or addition of any partner from or to the firm shall, in no manner, operate to terminate this agreement or in any

respect to interrupt the continuous character of the partnership or its business affairs, it being agreed that the senior partners and the survivors of them or those remaining as such (in the event of any withdrawal), for and on behalf of the firm, may at any time, admit any new members to the firm pursuant to this agreement, and have full authority to consent, on the part of all members of the firm, that members may withdraw therefrom, and new members admitted thereto; and the senior partners shall, at all times, have the sole general management of the business affairs of the firm, and shall have the sole power and authority to employ employees for and on behalf of said firm, and to fix the salaries of such employees, the Junior partners hereby expressly reposing full power in the senior partners to carry on the prudential affairs of the firm and they will conform to the directions given them by the senior partners, at all times, to promote the orderly conduct of said business, and they grant the senior partners exclusive authority to make all contracts and other agreements, and execute all obligations on behalf of the firm, including those affecting the relationship of the partners between themselves, when and to what extent contributions of service and property shall be accepted from any junior member of the firm and the nature and value thereof, so long as consistent with the provisions hereof and the character of the business of said partnership for which it is created. Only with the consent of the senior partners shall the firm be dissolved or any dissolution proceedings whatever be inaugurated. The senior partners are granted the right to dissolve the firm at any time on giving thirty days' notice to each then existing partner of their intention so to do, whereupon a complete accounting of the partnership business and affairs will be made by the senior

partners to all of the other partners, and this partnership agreement shall come to an end, and all of the physical property theretofore used by the firm in its business (whether acquired with partnership funds or not) shall revert to and become the property of Plymouth Manufacturing Corporation as provided by the terms of its lease, the other assets shall then be disposed of by the senior partners and the proceeds distributed, after payment of all debts of the firm in the same ratio as the annual distribution of profits hereinafter provided."

(6) "Each junior partner hereby agrees that the division of the net profits arising out of the operations of the business of the firm, allocable to the junior partners, after payment of all expenses of operation and drawing accounts hereinafter provided, shall be allocated and distributed in accordance with such arrangement as shall be made on behalf of the firm by the senior partners at the time each respective junior partner enters the firm; and each member hereby authorizes mutual agreements between the senior members of the firm on behalf of the partnership, and each respective junior member, as may, from time to time, enter the firm, fixing such division, but any original or modified agreements so made between a junior partner and the senior partners, the latter acting on behalf of the firm, shall be in writing, subscribed on behalf of the firm by at least one of the senior partners and by the individual junior partner directly affected thereby. Such stipulation shall provide, in every instance, for a fixed drawing account to be paid out of firm income to the junior partner periodically, and for an annual pro rata distribution of net profit among the junior partners, which drawing accounts and proration distributions shall be governed by what, in each in-

stance, the senior partners shall deem a just reflection of the contribution of each partner to the earnings and welfare of the firm, as expressed in such written arrangements, respectively, all of the partners reposing untrammeled discretion in the senior partners in the matter of determining what the respective net profits so distributable are or may be, and the respective proportions thereof to be paid to each. The form of certificate evidencing such arrangements, to be issued to each such junior partner, shall be substantially as follows:

## 'PLYMOUTH MANUFACTURING COMPANY'
### Plymouth, Indiana.

#### JUNIOR PARTNER'S PARTICIPATION CERTIFICATE

" 'This certificate, evidencing the profits participation agreement of the undersigned junior partner, issued in conformity with the general partnership agreement dated October 22, 1938, to which the holder is a signatory, and to be construed therewith, vouches that _____ (hereinafter called 'the holder' of No. _____ Street, _____ Indiana, is a junior partner, commencing as such as of the _____ day of _____, 19____, and is entitled to a periodical drawing account conformable with the provisions of said partnership agreement. The drawing account of each junior partner shall be based upon the basic drawing units of service rendered for and/or property contributed by such partner to the partnership. A basic drawing unit shall be valued in accordance with the worth to the partnership of the services and/or property each partner contributes to the partnership business. One hour of service contributed shall, in the case of the holder hereof, constitute a basic

unit and be reckoned at the value of _____ cents, which he shall be at liberty to withdraw from the partnership funds ten days after such contribution has been made.

" 'In addition to such drawing privileges, the holder hereof shall receive the proportionate share of ten per cent of the net profits of the firm business in each calendar year to which the holder hereof has contributed; and in calculating such net profits as a whole, there shall be deducted the total value of all basic drawing unit contributions actually paid out or credited to all of the partners—whether senior or junior.

" 'A basic drawing unit in property contribution shall be fixed at one dollar and the number thereof shall be reckoned at the actual value of the property contributed. The proportionate share of the holder in said distributable net profits of the firm shall be computed by a ratio application of the aggregate value of his total basic drawing units of contribution to the aggregate value of all basic drawing unit contributions effected by all of the junior partners, during the year, the holder's proportion being represented by ten per centum of the total net profits of the firm during the year multiplied by a fraction, the numerator of which constitutes the total value of all of the holder's basic drawing unit contributions during the year, and the denominator of which shall constitute the aggregate value of all of the drawing unit contributions made by all of the junior partners during such year.

" 'No interest in such annual distribution of net profits of the firm shall be claimable by any holder who has not contributed at least six hundred basic drawing units of service and/or property to the firm during the calendar year, but such share represented by such contribution of less than six hundred basic drawing units shall

be distributed to the junior partners who have contributed more than six hundred such units each.'

"The senior partners shall each have a drawing account for each week, in the amounts set after each name of such senior partner, namely:

William H. Wolfarth _____$23.00
Hubert Tanner _____$ ____
George E. Warren_____$20.00
Chester H. Thompson_____$20.00

payable at the end of each week, and in addition thereto, each shall receive two and one-half per cent of the net profits of said business, payable at the end of each calendar year. Whenever the term 'net profits' is used herein, unless the context otherwise indicates, it shall mean the gross profits of the business (after discharging or providing by reserves for all obligations of the firm, including obligations under the principal lease aforesaid) minus the several amounts credited to and/or withdrawn from the firm funds by the several partners, senior and junior, based on their unit contributions in services and property to or for the benefit of the firm."

(7) "A senior partner may withdraw from the firm at any time by giving thirty days' written notice to the other senior partners of his intention so to do, and another person may be admitted as a senior partner and substituted for the senior partner so withdrawing, provided such substitution is approved in writing by all senior partners. No senior partners shall assign his interest or rights in the partnership to any person, firm or corporation without the written consent of all the other senior partners."

(8) "No junior partner shall, at any time, sell, assign, or transfer his rights or interest in and to this partnership, but may withdraw from the firm at any time, provided the senior partners may require the

junior partner to continue as such for a period of not to exceed ten days after notice of withdrawal by said junior partner."

(9) "There shall be allocated ten per cent of the net profits of said business to the junior partners; each junior partner shall receive as his portion of the said ten per cent of the net profits of said business the proportion thereof during each calendar year in which the junior partner has contributed drawing units to the number of at least six hundred. The method of computation of such share in the net profits shall be affected as provided for by the certificate set forth in Article 6 hereof, and shall be payable not more than thirty days after the expiration of each calendar year. The proportions of net profits that would be allocable to junior partners who have contributed less than six hundred basic drawing units during the year to said firm, shall be distributed pro rata to the junior partners who shall have each contributed six hundred or more basic drawing units of service during the particular calendar year."

Counsel for the Plymouth Manufacturing Company take the position that claimant Zeits became a partner in said company when he signed the articles of agreement, and therefore does not come within the provisions of the Unemployment Compensation Law of this state.

The Unemployment Compensation Board, through the briefs filed upon its behalf, challenges the position taken by the Plymouth Manufacturing Company and contends that claimant Zeits was not a partner in said company but performed services constituting employment within the meaning of the provisions of the Unemployment Compensation Act.

This is the first case that has been submitted to this court involving the application of the Unemployment

Compensation Act to a given statement of facts, to which we add, under circumstances heretofore referred to, some of the provisions of the articles of agreement, denominated Articles of Partnership.

The relationship of claimant Zeits to the Plymouth Manufacturing Company is determined by the articles of agreement which he signed, interpreted with reference to the provisions of the Unemployment Compensation Act (Acts 1936, p. 80, and the amendments, Acts 1937, p. 705).

The declaration of public policy of the Act (§ 52-1501, Burns' 1933 (Supp.)) clearly indicates that the Act is purposed as a relief to unemployment for those who for a time enjoy a service relationship followed by a period of unemployment. Therefore, any contract for the performance of service will be scrutinized beyond the mere form for the purpose of determining whether the relationship of the parties involved falls within the provisions of the Act.

Let us first determine, without regard to the question of partnership, whether Zeits, under the facts, comes within the provisions of the Unemployment Compensation Act.

Upon examination of the Act we find that § 52-1501, Burns' 1933 (Supp.), contains a glossary of definitions of certain terms which aid in determining the relationship of the claimant to the Plymouth Manufacturing Company.

" 'Employing unit' means: Any individual or type of organization, including any partnership, association. . . ." § 52-1502 (f) (1), Burns' 1933 (Supp.).

" 'Employment' . . . means service, including service in interstate commerce, performed for remuneration, or under any contract of hire, written or oral, express or implied." § 52-1502 (h) (1), Burns' 1933 (Supp.).

There are certain exceptions but they deserve no consideration in this case.

Section 52-1502, subsec. (5), par. (A) and (B), Burns' 1933 (Supp.), provides:

"(5) Services performed by an individual for remuneration shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the board that:

"(A) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and

"(B) Such individual is customarily engaged in an independent established trade, occupation, profession or business; or is an agent receiving remuneration solely upon a commission basis, and who is the master of his own time and effort. . . .

" 'Remuneration' means all compensation payable for personal services, including commissions and bonuses and the cash value of all compensation payable in any medium other than cash. . . . [Subsection (p)].

" 'Wages' means all remuneration for employment, including the cash value of all remuneration payable in any medium other than cash, payable to an individual by an employer with respect to employment [Subsection (r)]."

The facts submitted and considered by this court reveal that upon the execution of the articles of agreement there existed an "employing unit." This ▮ consisted of the senior partners who were empowered by the articles to employ employees.

The claimant by reason of his services for which he received so many cents per hour comes within the definition of "employment."

The fact that compensation was paid claimant for personal service meets the requirements of the term "remuneration."

It naturally follows from the foregoing statements with reference to the terms "employment" and "remuneration" that claimant was the recipient of "wages" as defined in the Act.

The only other provisions of the Act which call for consideration under the facts before us are paragraphs (A) and (B) under subsection (5), § 52-1502, *supra*. Both of the tests under these paragraphs must be established in order that benefits be denied one otherwise entitled thereto. *Globe Grain Milling Co.* v. *Industrial Commission* (1939), 98 Utah 36, 91 P. (2d) 512.

No question arises concerning paragraph (B) and our only inquiry respecting this feature of the Act is directed to paragraph (A). Was claimant free from control or direction over the performance of the service he rendered both under the contract and in fact?

Referring to the portion of the articles of agreement herein before set out we find that paragraph (2) of the articles provides that the senior partners will at all times have general charge and control of the property and shall direct the work done by the junior partners, of which claimant was one. By the provisions of the same section any junior partner guilty of any unlawful, unworkmanlike practice or conduct or disloyalty was subject to have his connection with the firm terminated by the action of the senior partners. In Section (3) of said articles the junior partners expressly agree to repose full power in the senior partners to carry on the prudential affairs of the firm, and further agree that they will conform to the directions given them by

senior partners, at all times, to promote the orderly conduct of said company. By this same section the junior partners give the senior partners authority to determine when and to what extent contributions of service and property shall be accepted from any junior member, and the nature and value thereof, etc. Only with the consent of the senior partners shall the firm be dissolved or dissolution proceedings be inaugurated.

We think these various provisions are sufficient to show that the claimant was not to be free from control and direction over the contribution or performance of any service rendered by him to the firm. In addition to the provisions of the articles of agreement, the facts submitted by the Review Board contain this statement: "The Superintendent had authority to assign the Junior Partners to their respective positions, supervise the same, and fix their hourly rates of payment for services." If it be said claimant was free from control or direction under his contract, the above-quoted statement is conclusive that claimant was not free from control or direction *in fact,* a requisite of (5) (A).

Our next and last inquiry is: What effect does claimant's membership in this association, as fixed by the Articles of Partnership which he signed, have upon his status as a claimant?

There are many definitions of "partnership" stated by courts and eminent jurists. There are also different essentials which have been held to be the test of the existence of a partnership relation. The case of *Bacon* v. *Christian* (1916), 184 Ind. 517, 111 N. E. 628, emphasizes the fact that there must be a voluntary contract to carry on the business with intention of the parties to share the profits as common owners thereof. In speaking of "intention" this language is used:

"But it must be borne in mind, however, that the intent, the existence of which is deemed essential, is an intent to do those things which constitute a partnership."

The case of *Macy* v. *Combs* (1860), 15 Ind. 469, stresses sharing the profits, as profits, as an essential to constitute the existence of a partnership.. In the case of *Bond* v. *May* (1906), 38 Ind. App. 396, 78 N. E. 260, the Court used this language:

"To be a partner, one must have an interest with another in the profits of a business, as profits. There must be a voluntary contract to carry on a business with intention of the parties to share the profits as common owners thereof."

In the case of *Aylesworth* v. *Aylesworth* (1915), 184 Ind. 80, 109 N. E. 750, it is held that the question of the existence of a partnership is one of fact, and is not controlled by the phraseology of the scrivener who prepared the agreement.

For the purpose of this case a fair definition of partnership would seem to be: A voluntary contract of association for the purpose of sharing the profits, as such, which may arise from the use of labor or skill in a common enterprise; and an intention of the parties to form a partnership for that purpose.

While the Articles of Partnership provide for the contribution of property, the briefs of the Plymouth Manufacturing Company concede that, "there was no investment of any kind by any member of the firm— senior or junior—excepting as they severally 'invested' therein their individual skills and labor."

Some contention is made that claimant Zeits was not a voluntary signatory to the Articles of Partnership, but we cannot, from the facts submitted, uphold such contention. It is probably true that the inducing cause,

which resulted in Zeits' signature to the Articles of Partnership, was the desire to secure employment for which he would draw compensation for his labor, but his signature was not secured by coercion or fraud.

Based upon the facts, we are unable to find that there was any genuine intention on the part of the junior partners to enter into a partnership agreement.

What rights or advantages did the junior partners have over ordinary employees? They were subject to control and direction, and by the terms of the contract, senior partners were fully authorized to, and did, control the junior membership and the tenure of their participation in the association. As further bearing on the question of intention the senior partners evaluated the drawing account of the junior partners, had full power over the question of dissolution, and could in effect hire any new junior member and fire old ones. In addition to this the sublease to the firm ran from month to month, and the original lease to the senior partners was for a like period.

There was a provision by which the junior partners would divide among them, on a basis fixed by the articles of association, ten per cent of the net profits. Assuming the organization made a profit of fifty thousand dollars ($50,000) per year, this would leave five thousand dollars ($5,000) to be distributed among the junior partners. If they were all to share equally, according to the number signing the original articles of agreement, each junior partner would receive less than fifty dollars ($50). It is not plausible that such a sum would foster a voluntary intention to execute the articles of agreement. The share received of the net earnings by each of the junior partners is more consonant with a

bonus, which, under our Unemployment Compensation Act, is compensation.

The share of the net earnings as compensation is antagonistic to sharing the profits, as profits, and removes that essential to the existence of a partnership.

The Articles of Partnership are meticulously and cautiously drafted and some of the language used calls for analysis. The junior partner's Participation Certificate, set out as a part of the agreement, provides that, "One hour of service contributed shall, in the case of the holder hereof, constitute a basic unit and be reckoned at a value of _____ cents, which he shall be at liberty to withdraw from the partnership funds ten days after such contribution has been made." While this particular clause speaks of a contribution of service, it also provides a remuneration for such service at a value of so many cents per hour agreed upon by the senior partners under the original agreement and the holder of such certificate, and by the Board of Control and the holder of such certificate, subsequent to the amendment of the articles on the seventh day of November, 1939.

An hour of service could only be contributed by the individual performance of such service, and if the value of such contribution or performance could only be withdrawn from the partnership funds subsequent to such contribution or performance, then we have a service performed for remuneration. This situation created a service relationship between the "employing unit" and the junior partners which would entitle the junior partners to the benefits of the Unemployment Compensation Act, unless it is shown that the claimant be excluded on some ground for which provision is made in the Act itself.

Examination of Article 6 of the partnership agreement discloses that the drawing accounts of the junior partners are to be paid out of the income of the firm which includes gross profits. Persons who share in the gross returns and receipts are not necessarily partners. Lindley on Partnerships, 9th Edition, pp. 42-44.

We hold that under all the circumstances as shown by the facts that there was not a sharing of the profits, as such, by the junior partners and therefore this essential of a partnership is lacking.

With both essentials, intention, and sharing profits as such, missing, a partnership relation between the senior partners and the junior partners cannot be sustained.

Our view is influenced by the decisions of other courts which have had under consideration similar statutes.

In the *Globe Grain Milling Company* v. *Industrial Commission, supra,* speaking with regard to a section of a statute quite similar to § 52-1502, Subsection (5) (A) (B) of our statute, it was held that this section signifies a relationship entitled to benefits of the Act beyond that of mere master and servant relationship. To the same effect is the statement of the court in *McDermott* v. *State* (1938), 196 Wash. 261, 82 P. (2d) 568. On the right of the legislature to fix standards of interpretation the Supreme Court of the United States said, the power of the General Assembly to broaden or restrict common law concepts is widely recognized. *New York Central R. Co.* v. *White,* 243 U. S. 188.

The Supreme Court of North Carolina in a decision involving the Unemployment Compensation Act of that state uses this language:

"An examination of the pertinent definitions in the Unemployment Compensation Act makes it

readily apparent that such words as 'employment,' 'employer,' 'employing unit,' 'wages,' and 'remuneration,' when used in the Act, are not used as words of art having rigid, precise and restricted meanings, but rather, as defined by the Act itself, are used as broad terms of description, evidencing a legislative intent to give to the Act a broad and liberal coverage to the end that the far-reaching effects of unemployment may be alleviated." *Unemployment Compensation Commission* v. *Jefferson Standard Life Ins. Co.* (1939), 215 N. C. 479, 2 S. E. (2d) 584.

This court has spoken with reference to the liberal interpretation of legislation of this character in the case of *Kunkler* v. *Mauck* (1940), *ante* p. 98, 27 N. E. (2d) 97, and cases therein cited.

We further hold that the amendments of November 7, 1939, to the Articles of Partnership, did not change the status of one who was formerly a junior partner as to his rights to claim benefits under the act in question.

Our answers to the certified questions of law are as follows:

(1)  The Plymouth Manufacturing Company was a partnership prior to November 7, 1939, and its membership was composed of the parties designated Senior Partners.

(2)  The Plymouth Manufacturing Company was a partnership subsequent to November 7, 1939, and the membership of the Board of Control were the partners.

(3)  Yes.

(4)  Yes.

(5)  Yes.

The answers to questions one to five, inclusive, make unnecessary an answer to question six as the Board has all the evidence before it.

NOTE.—Reported in 31 N. E. (2d) 209.