POWELL *v.* EMPLOYMENT SECURITY COMMISSION.

1. Unemployment Compensation — Photograph Negative Re-
touchers.

Retoucher of photograph negatives who did work elsewhere
than on photographer's premises, with her own equipment,
on a piecework basis and on her own time, subject only to
the requirements that negatives must be completed within 7
days, returned incomplete or extension of time obtained and
work must be satisfactory to the photographer, was an inde-
pendent contractor and not an "employee" as that term is used
in the employment security act (CLS 1954, §§ 421.42[1],
421.44[1]).

2. Same—Test of Employee Relationship.

The test of the employer and employee relationship under the
employment security act is the right to control, whether in
fact exercised or not (CLS 1954, §§ 421.42[1], 421.44[1]).

3. Same—Employer-Employee Relation Depend On Facts of
Each Case.

The question of whether an indivdual is an employee or an in-
dependent contractor, under the employment security act,
must depend on the facts and circumstances of each case.

4. Same—Photograph Negative Retouchers—Independent Con-
tractors—Federal Statutes—Withholding Tax.

The consideration of the impact of a Federal act on question
of whether photograph negative retouchers who worked on
a piecework basis off the photographer's premises and with
their own tools is not determined on review of certiorari to
employment security commission, where they are determined
to be independent contractors and the United States treasury

---

References for Points in Headnotes

[1–3] 48 Am Jur, Social Security, Unemployment Insurance, and
Retirement Funds § 17.

[4] 48 Am Jur, Social Security, Unemployment Insurance, and Re-
tirement Funds § 32.

department ruled that the photographer need not withhold income tax from payments made (CL 1948, § 421.2[6] [n], as amended by PA 1949, No 282).

5. COSTS—UNEMPLOYMENT COMPENSATION—PHOTOGRAPH NEGATIVE RETOUCHERS—PIECEWORK BASIS.

No costs are allowed in proceeding wherein it is determined that persons who retouch photograph negatives on a piecework basis with their own tools elsewhere than on the photographer's premises were independent contractors and not employees of the photographer, a public question being involved (CLS 1954, §§ 421.42[1], 421.44[1]).

SMITH, J., dissenting.

Appeal from Wayne; Brennan (Vincent M.), J. Submitted October 4, 1955. (Docket No. 17, Calendar No. 46,517.) Decided April 2, 1956.

Certiorari by H. A. Powell and Florence L. Powell, doing business as H. A. Powell Studios, against Employment Security Commission and the appeal board thereof to review proceedings by which Rebecca Cohen and others were determined to be employees rather than independent contractors engaged in retouching of photograph negatives. Judgment for defendants. Plaintiffs appeal. Reversed and remanded.

*Clark, Klein, Brucker & Waples,* for plaintiffs.

*Thomas M. Kavanagh,* Attorney General, *Edmund E. Shepherd,* Solicitor General, and *Edward Coughlin,* Assistant Attorney General, for defendants.

BOYLES, J. The controlling question here for decision is whether one Rebecca Cohen, who was paid by plaintiffs-appellants $1 for each photograph negative she "retouched" for the studio, was their employee, or an independent contractor, under the

Michigan employment security act,* formerly called the Michigan unemployment compensation act.

The usual statutory processes have been followed within the defendant commission, culminating in the appeal to this Court from a judgment entered in the circuit court for Wayne county holding that Rebecca Cohen was an employee of the plaintiffs within the meaning of section 42(1) and section 44(1) of the act.† Hearings were held before a referee of the commission on the question whether Rebecca Cohen was an employee of the plaintiffs, the appeal board of the commission affirmed the finding of the referee that Rebecca Cohen was an employee of the plaintiffs, and, on review by certiorari in the circuit court, that decision was affirmed. Plaintiffs appeal. The facts are not in dispute.

Plaintiffs, doing business as the H. A. Powell Studios, are engaged in the business of taking pictures, developing, retouching and printing portraits for the general public. Most of their work is done in their studios in Detroit. However, they do not have sufficient space in their studios to accommodate all of the work of retouching negatives and some of it is done by other retouchers than those regularly employed by plaintiffs on their premises. Rebecca Cohen applied for and obtained negatives from plaintiffs to take home, to be retouched by her at home and returned. Plaintiffs' business has tended to specialize, they principally do portrait work. A large share of this consists of photographing students for high school annuals. After the pictures are taken and the negatives developed, further work is required on them which is known as retouching.

---

*PA 1936 (Ex Sess), No 1, as amended (CL 1948 and CLS 1954, § 421.1 et seq. [Stat Ann 1950 Rev and Stat Ann 1953 Cum Supp § 17.501 et seq.]).
† CLS 1954, §§ 421.42(1), 421.44(1) (Stat Ann 1953 Cum Supp §§ 17.545[1], 17.548[1]). The subsequent amendment by PA 1955, No 281, effective July 15, 1955, does not apply here.

This consists of softening high lights, brightening shadows, removing facial blemishes, and spotting the negatives. Because of the principal type of work done by plaintiffs, they have busy seasons from September to December, and from January to May. During these periods they have a much larger number of negatives which require retouching. This additional work is given to "outside" or free-lance retouchers, who pick up the negatives at plaintiffs' place of business, retouch them at their home or at some other place, and return them. Occasionally, some of the work is given to other studios. Rebecca Cohen was one of these "outside" retouchers. The tools required for the work are furnished by the retouchers themselves, and consist of lead pencils, etching knives, reducing pencils, abrasive removers, and a box with a light in it. The outside retouchers are permitted to take as many negatives at one time as they desire, but they must complete and return them within 7 days. If this is not done, they must either get an extension of the completion time or return them in an incompleted state. Ordinarily, if any of the work is defective, the retoucher corrects it himself. When work slackens, plaintiffs first relieve the outside retouchers whose work is not of as high a quality as that of the others.

Plaintiffs also employ a number of "inside" retouchers. The number of these apparently varies from time to time. They work regular hours and are paid on the same piecework basis as the outside retouchers. Rebecca Cohen was given negatives by appellants which she took home and worked on. She did no work on the appellants' premises. She owned all of her own equipment. As an outside retoucher, she was not required to follow any schedule or account to appellants for her time. She was allowed to take as many negatives home as she wanted, the only restriction being that at the end of 7 days all

negatives had to be returned. The more difficult phase of retouching consists of correcting and altering the eyes, mouth, nose and hair, which requires supervision, and this was done by the "inside" retouchers, who were under direct supervision. Outside retouchers were paid on a piecework basis. During the rush periods retouching work was given out to about 25 "outside" retouchers. Some of it was sent out to competitors of plaintiffs, to retouch Powell Studio negatives. All outside retouchers received $1 per negative. There was a distinction between Rebecca Cohen's work and that of the so-called "inside" retouchers, who worked on more important details under direct supervision, on plaintiffs' premises. Several inside retouchers were employed by the studio on a regular basis. They were under supervision, required to work on schedule, and their hours of employment and work assignments were regulated. They were paid on a regular payroll check.

We have recently passed upon a situation which seems to have been sufficiently identical with the above facts, and decision here is controlled by *Michigan Bulb Co.* v. *Unemployment Compensation Commission,* 337 Mich 292.

Necessarily, there will always be some variation in the facts and circumstances which can be claimed to distinguish each case from previous decisions. This is true in the case at bar. However, we do not find in the instant case any substantial difference from the *Michigan Bulb Case* in its facts and circumstances which would lead us to conclude that the so-called *Michigan Bulb Case, supra,* should not be followed in the instant case. Fundamentally, decision must be based on the conclusion announced by this Court in 1940 in *Lewis* v. *Summers,* 295 Mich 20, 23, where Mr. Justice WIEST, in writing for the

Court, quoted with approval from *Dennis* v. *Sinclair Lumber & Fuel Co.*, 242 Mich 89, 92, as follows:

"This Court has held that the test of the relationship [employer and employee] is the right to control, whether in fact exercised or not. *Tuttle* v. *Embury-Martin Lumber Co.*, 192 Mich 385 (Ann Cas 1918C, 664)."

The record in the instant case does not show sufficient facts and circumstances to establish the right of the plaintiffs to control the acts of Rebecca Cohen, for us to conclude that she was an employee of the plaintiffs, and not an independent contractor. The 2 incidents present in the case at bar on which the defendants mainly rely to establish such essential right of the plaintiffs to control the work are that Rebecca Cohen had to return the negatives within 7 days, and that the work must have been satisfactory according to the instructions of the plaintiffs. But these 2 criteria might apply equally to an independent contractor as well as to an employee. Otherwise, Rebecca Cohen was entirely "on her own" insofar as there was any control over her work by the plaintiffs. The right of the plaintiffs to set the time within which the work must be done, and to decide whether or not the finished product was satisfactory to the plaintiffs, is not sufficient to establish that she was an employee, and not an independent contractor.

Our decision in the *Michigan Bulb Case* was handed down after the lower court had decided that Rebecca Cohen was an employee, but was later brought to the attention of that court by a petition for a rehearing. The trial court then affirmed its decision, filing an opinion to distinguish the *Michigan Bulb Case* from the instant case on the aforesaid grounds, neither of which is considered as controlling of decision. While it is true that plaintiffs

relied on a preliminary showing by Rebecca Cohen that she had the necessary skill and ability to retouch the negatives satisfactorily to the requirements of the plaintiffs, this would likewise be true if she were an independent contractor. The final test of her work was whether the finished product was satisfactory. If not, she was not paid until the work had been done over. The requirement that the work had to be "performed according to the standards set up by the studio" would apply equally to the work of an independent contractor. None of these incidental facts can be set up as the yardstick to establish a difference between an independent contractor and an employee.

In the view we take of the controlling question in this case, it is not necessary to pass on other grounds argued in the briefs, including the impact of the Federal act of congress on the question here, brought into the argument by counsel, under section 42 (6) (n) of the act.* See *Pazan v. Unemployment Compensation Commission* (decided December 1, 1955), 343 Mich 587. Furthermore, appellants had sought and received a ruling from the United States treasury department, as follows:

"Receipt is acknowledged of your letter dated November 19, 1943, regarding the status of retouchers under the withholding provisions of the current tax payment act. You state that these persons come to your studio to pick up negatives which they take home to retouch. It appears that these persons perform similar services for other studios and that you have no control over time and place of their work.

"From the information submitted, it is the opinion of this office that these persons are independent agents. Employers are required to withhold income tax from wages paid to employees only. No with-

* CL 1948, § 421.42(6)(n), as amended by PA 1949, No 282 (Stat Ann 1950 Rev § 17.545[6] [n]).—REPORTER.

holding is required from amounts paid to independent agents."

Obviously, the question whether an individual is an employee or an independent contractor, under the provisions of the employment security act, is debatable, and must depend on the facts and circumstances of each case. The recent *Michigan Bulb Case* is decisive of the question here. See, also, *Bonifas-Gorman Lumber Co.* v. *Unemployment Compensation Commission,* 313 Mich 363; *Louis A. Demute, Inc.,* v. *Employment Security Commission,* 339 Mich 713.

Reversed and remanded for entry of an order setting aside the judgment, and for entry of a judgment setting aside the decision of the appeal board that Rebecca Cohen was an employee of the plaintiffs. No costs, a public question being involved.

DETHMERS, C. J., and SHARPE, REID, KELLY, and CARR, JJ., concurred with BOYLES, J.

SMITH, J. (*dissenting*). I cannot agree that the Michigan employment security act* denies to the worker before us the status of an employee.

The question is whether or not Rebecca Cohen's work constituted "employment" within the meaning of the act. The term "employment" is defined in the act as follows:

"Subject to the other provisions of this section 'employment' means service, including service in interstate commerce, performed for remuneration or under any contract of hire, written or oral, express or implied." (CLS 1954, § 421.42 [1] [Stat Ann 1953 Cum Supp § 17.545 (1)].)

---

* PA 1936 (Ex Sess), No 1, as amended (CL 1948 and CLS 1954, § 421.1 *et. seq.* [Stat Ann 1950 Rev and Stat Ann 1953 Cum Supp § 17.501 *et seq.*]).

"Remuneration," referred to above, is defined by the act as follows:

" 'Remuneration' means all compensation paid for personal services, including commissions and bonuses and the cash value of all compensation payable in any medium other than cash: Provided, That any remuneration payable to an individual which has not been actually received by such individual within 21 days after the end of the pay period in which such remuneration was earned shall, for the purposes of subsection (2) of this section, be deemed to have been paid on the 21st day after the end of such pay period. The reasonable cash value of compensation payable in any medium other than cash, shall be estimated and determined in accordance with rules prescribed by the commission: Provided further, That the term 'remuneration' shall not include moneys paid an individual by any unit of government for services rendered as a member of the national guard of the State of Michigan, or for similar services to any State or the United States." (CLS 1954, § 421.44 [1] [Stat Ann 1953 Cum Supp § 17.548 (1)].)

There is no need to restate the facts. Rebecca Cohen was one of that great host of workers we have known from the earliest times, the industrial home-workers. They include seamstresses, artificial flower makers, tailors, typists, retouchers, and other servants who shuttle daily between the home, which serves them both as castle and mill, and the plant, where they receive their piecework pay and the next day's bundle. The claim that these humble workers, who perform their assigned tasks in their own homes, are independent contractors because allegedly free of their employer's "control" is not a new one. The language employed by Circuit Judge Parker in *United States* v. *Vogue, Inc.* (CCA), 145 F2d 609, 611, in rejecting such claim is worthy of repetition:

"The law of independent contractors has an important place in the law, but surely it was never intended to apply to humble employees of this sort, so completely subject to the domination and control of the employer. To allow the employer to escape the consequences or to deny the employee the benefits of the employer-employee relationship because of agreement that payment be made on the piecework basis or because the employee exercises the judgment with respect to the work that is expected of any skilled worker, is to lose the substance of the relationship in attempting to apply certain rule-of-thumb distinctions in the law of independent contractors. The fact that one having an independent calling, such as a cook, gardener or chauffeur, exercises a judgment as to the work done free of detailed direction by his employer does not make him an independent contractor (27 Am Jur, Independent Contractors, § 17, p 498; note Ann Cas 1918C, p 653 *et seq.*) ; and we think there can be no question here but that there was such general right of control by plaintiff over these women, who were making repairs in the store on goods sold to its customers, as to establish beyond question the employer-employee relationship with the incidents thereto pertaining."

Likewise, in the case at bar, it offends my sense of realities, and the clear purposes of the act, to describe such servants of one master, these integral cogs of a larger business machine, as independent contractors, independent businessmen and women. They are utterly dependent, as a matter of economic reality, upon another, their employer. It was the distress of such dependent workers, and their families, that this act was designed, in part, to alleviate. The evils of mass unemployment are vivid in the minds of all mature men and women. The handout and the parish poor box, we learned, do not suffice. It was this act which was designed to replace the meager and haphazard charitable donations of the

past. Thus came into existence the Federal social security act and the various State statutes passed, as was that of this State, "to provide for the cooperation of this State and compliance with the provisions of the social security act and the Wagner-Peyser act passed by the Congress of the United States of America." (PA 1936 [Ex Sess], No 1.)

In all of this I find no hint of necessity for the exercise of control over one person by another in order that the legislative concern for the welfare of our people may be exercised. The opinion of Mr. Justice BOYLES, however, turns on the question of control. He holds that the decision of the appeal board that Rebecca Cohen "was an employee of the plaintiffs" must be set aside. We have held, he points out, "that the test of the relationship (employer and employee) is the right to control, whether in fact exercised or not," and that "the record in the instant case does not show sufficient facts and circumstances to establish the right of the plaintiffs to control the acts of Rebecca Cohen, for us to conclude that she was an employee of the plaintiffs, and not an independent contractor."

We thus determine and decide that Rebecca Cohen is not, for the purpose of unemployment compensation, an employee. I cannot accept the result. This woman before us depends, for her livelihood upon one employer, whom she serves continuously on a day-by-day basis. She has no established "business" unless we so dignify the sale of her manual dexterity. She has neither shop nor salesroom, unless such we call the kitchen or dining room, where she works. She has no industrial machinery, save her bare hands and the pencil held therein, a light, and the desk at which she works. She does not hold herself out as being in business for herself. We find not in the record before us her business card, a business telephone listing, or an example of a paid ad-

vertisement. She has no pay roll, no employees. She does the same work as those who work under the company roof. She is paid the same piecework rate, a dollar a head. She is supervised no differently. She can be fired at will. If this is independence the word has acquired a new meaning, a meaning strange and foreign to our deep-rooted ideas of independence, a meaning with overtones both ominous and subtle. I reject it.

The "test" which my Brother has employed is the so-called control test. Our Court uses it as a universal solvent. If we are confronted with the question of whether a third person can recover damages for a tort inflicted by an alleged servant, we apply the control test to determine the latter's status. *Brinker* v. *Koenig Coal & Supply Co.*, 312 Mich 534. If we have to determine whether or not our compensation law governs a workman under certain circumstances we apply the control test. *Salmon* v. *Bagley Laundry Co.*, 344 Mich 471. If we have to determine whether our unemployment compensation law is applicable to a certain class of workmen we now seek to apply the same test. What is overlooked in so doing is that the objectives of these actions are all different and that, just as one may be a State "officer" for one purpose, though not for another (*Schobert* v. *Inter-County Drainage Board*, 342 Mich 270), so one may be an employee for the purposes of certain legislation but not for the purposes of another aimed at a different mischief. See *Globe Grain & Milling Co.* v. *Industrial Commission*, 98 Utah 36 (91 P2d 512).

I have not, in previous dissenting opinions (*Salmon* v. *Bagley Laundry Co., supra; Pazan* v. *Unemployment Compensation Commission*, 343 Mich 587) exhausted the deficiencies of this dubious tort test which is sought to govern the administration of today's enlightened acts of social legislation.

Were this case merely an isolated instance in which the law, in its glacial movement, has not yet revised ancient formulae to fit today's facts, we might be tempted to look the other way, secure in the knowledge that in some dramatic fact situation the tragedy of what is being done would become apparent to all and that a unanimous court would then equate the law to the facts. But the times will not wait for us. The problem before us pervades the entire area of social legislation. It is necessary constantly to distinguish between the "mere employee" and the independent contractor. At the extremes the cases are clear, but the numbers of those working in the twilight zone of employment where, either by deft surgery, or because of the structure of the modern business machine, certain of the elements of common-law, elbow-to-elbow "control" have been removed, are well over a million. See Senate Finance Committee on H J Res 296, 80th Cong (2d Sess), Sen Rep No 1255 (1948); Willcox, 8 Vanderbilt LR 245, 246. We will again have at the ancient error, in order that our workers be not denied, through error of law, that which our people have granted as the public conscience has quickened with new life.

We must make an historical excursion. The independent contractor, so-called, is a relative newcomer to the law. He was brought into being as a limitation upon the unrestrained application of the doctrine of *respondeat superior.* See *Bush* v. *Steinman,* 1 B & P 404 (C P Ex Ch 1799, 126 Eng Rep 978); *Sadler* v. *Henlock,* 4 El & Bl 570 (119 Eng Rep 209); *Millegan* v. *Wedge,* 12 Ad & El 737 (113 Eng Rep 993); *Quarman* v. *Burnett,* 6 M & W 499 (151 Eng Rep 509); and *Laugher* v. *Pointer,* 5 B & C 547 (108 Eng Rep 204). Law review material of interest may be found in Young B. Smith's, Frolic and Detour, 23 Col L R 444; Douglas, Vicarious Lia-

bility and Administration of Risk, 38 Yale L J 584; Talbot Smith, Scope of the Business: The Borrowed Servant Problem, 38 Mich L R 1222; Stevens, The Test of the Employment Relation, 38 Mich L R 188, and articles and treatises cited. He was possessed of skills not common to all, and in the exercise thereof he pursued his independent calling, or business, or occupation. Under such circumstances it was unacceptable to the judges in the early formulative period, that one hiring another for work involving a unique skill (drover, doctor) should be held liable for the negligence of him so hired. The employer's inability to perform the work himself was the reason why the specialist was hired. Thus 1 Shearman & Redfield's Treatise on the Law of Negligence (6th ed), pp 395, 396, describes the doctrine in these terms:

"Although, in a general sense, every person who enters into a contract may be called a 'contractor,' yet that word, for want of a better one, has come to be used with special reference to a person who, in the pursuit of an independent business, undertakes to do a specific piece of work for other persons, using his own means and methods, without submitting himself to their control in respect of all its details. The true test of a 'contractor' would seem to be, that he renders the service in the course of an independent occupation, representing the will of his employer only as to the *result* of his work, and not as to the means by which it is accomplished."

2 Cooley on Torts (3d ed), p 1098, uses similar language:

"'An independent contractor is one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to the control of his employer, except as to the result of his work.' The term contractor is applicable to all persons following a regu-

lar, independent employment, in the course of which they offer their services to the public to accept orders and execute commissions for all who may employ them in a certain line of duty, using their own means for the purpose, and being accountable only for final performance."

An early Michigan case, *DeForrest* v. *Wright,* 2 Mich 368, 369, 370, is equally clear:

"This greatly vexed question [the liability of a master for the acts of his servant], as an eminent judge has pronounced it, has been very much discussed, not only in the English courts, but in our own. The difficulty in deciding cases involving the question presented, has been in determining what facts and circumstances legally constitute the relation of master and servant, or under what circumstances one person will be held liable for injuries occasioned by the negligence or unskillfulness of another employed in his behalf. To hold that every person, under all circumstances, would be responsible for injuries committed by another person while employed in his behalf, involves an absurdity no one would countenance. It would create a penalty from which few could escape; for every man is or ought to be directly or indirectly, nearly or remotely engaged in the service or on behalf of his fellow man. But from an examination and comparison of the adjudged cases, the rule now seems very clearly to be this, that where the person employed is in the exercise of an independent and distinct employment, and not under the immediate control, direction, or supervision of the employer, the latter is not responsible for the negligence or misdoings of the former."

But there is always the exception. There are those who, having hired an independent contractor, will not leave him alone. Command is assumed and directions are given. In this situation, if a third person is injured, liability is not hard to place. Once

we start to control a person (be he independent contractor or anyone else) the law fastens liability upon us by plainest principles of agency. We have made the erstwhile independent our servant because, as the saying goes, we have assumed to "boss him around." He has become, in fact, our servant. This has been true since the very inception of the doctrine. The following language from *Quarman v. Burnett, supra,* 507, is significant:

"It is undoubtedly true, that there may be special circumstances which may render the hirer of job-horses and servants responsible for the neglect of a servant, though not liable by virtue of the general relation of master and servant. He may become so by his own conduct, as by taking the actual management of the horses, or ordering the servant to drive in a particular manner, which occasions the damage complained of, or to absent himself at one particular moment, and the like."

Our Court, in *DeForrest v. Wright, supra,* 372, held likewise:

"The record shows that the draymen of the city of Detroit are a body of men in the exercise of a separate, distinct, and independent employment, using their own teams and drays, and duly licensed; and I can see no reason, either in law, equity, or sound policy, that should exempt them from the liabilities of other persons engaged in the ordinary affairs of life, who are alone responsible for their acts.

"Undoubtedly any one or more of them might so place themselves under the immediate direction and control of another person as to raise the relation of master and servant; and that, whether we regard them strictly as common carriers, or otherwise. But the case exhibits no such state of facts."

(For more extended discussion see Jacobs, Are "Independent Contractors" Really Independent? 3

DePaul L R 23, and Smith, Collateral Negligence, 25 Minn L R 399.)

So much for the history of the doctrine. The principles involved are relatively clear. A servant does his master's bidding, and for his torts the master is liable. But an independent contractor does no master's bidding. He is his own master. He exercises the skills of his calling in his own way. For his torts his employer is not liable unless, of course, the employer has assumed control over him in which case he will be liable as for any other servant controlled. Thus the formula: An independent contractor is one who, carrying on an independent business, contracts to do a piece of work according to his own methods, and without being subject to control by his employer as to the means by which the result is to be accomplished but only as to the "result of the work." *Hanisko* v. *Fitzpatrick Brothers,* 232 Mich 593, 595.

It is a complete perversion of this principle to employ the control exception (an independent contractor does not remain such if made subject to control) as a test for his status as an independent contractor in the first place. It is much as though we employed the well-known exceptions to the corporate entity doctrine as tests for the existence of the corporation itself. Confusion is inevitable.

All of this, however, has to do with the law of torts, of damage suits. I have written, in previous dissenting opinions, of the inapplicability of a tort concept to the administration of social legislation and I shall not repeat here what was said there. One of its many difficulties is that this test, so borrowed from the law of torts, is capable of producing any result, of rationalizing any fact situation, depending upon whether we use the word "control" to mean peremptory order, request, command, direction, suggestion, implication, or other shade of meaning in

the transmission of will, wish, or desire, whether these elements must be express, or need only be implied, in fact or law, and whether an unexercised "right" as to them is sufficient.

In its actual operation the control test reflects the ambiguities of its meanings. The decisions in this field are in a state of indescribable confusion. Those interested in pursuing these cases in detail, with citations of several pages of contradictory, inconsistent and confusing holdings on essentially similar fact situations under essentially similar statutes are referred to Teple's exhaustive compilation in 10 Ohio State L J 153, "The Employer-Employee Relationship." The decision cannot be reconciled save upon minute factual differences, which, having once served their purpose of distinction, receive scant attention in succeeding cases.

But the control test reaches its lowest level of futility when it is employed in those cases in which no control is possible from the very nature of the work. Under such circumstances although the employer's "relinquishment" of his right to control has no factual significance whatever, legally it may be regarded as decisive. Thus laborers are employed to empty a carload of coal. The employer insists that he does not control them, that he did not hire their "services" but only contracted for the "result," an empty car. The means of unloading, he says, are their own, *i.e.*, they can shovel right-handed or left-handed, start at one end of the car or the other. *United States* v. *Silk,* 331 US 704 (67 S Ct 1463, 91 L ed 1757). Or a typist is employed to type mailing stickers from a list of customers. Again the employer argues that he has no control over the way the work is done, meaning, presumably, that the typist can type the letters of the words she must copy in any order she chooses. See *Michigan Bulb Co.* v. *Unemployment Compensation Commission,*

337 Mich 292. The administration of an act designed
to relieve human want should not be made to depend
upon our resolution of such verbal antics.

The use of this legal chameleon as a "test" is,
moreover, an open invitation to statutory evasion.
In Jacobs' careful study, *supra,* it is noted that:

"It would appear as more than mere coincidence
that after the '100 days' of new deal legislative ac-
tion, the company suddenly 'discontinued the use of
employment contracts and adopted the lease or sub-
lease forms' under which it later contended that the
trappers were 'independent' businessmen. The ben-
efits to such employers were manifold. By such con-
version employers sought to obviate any statutory
obligations under the national labor relations act,
under the social security, unemployment compensa-
tion, and fair labor standards acts, and, in addition,
many of the other Federal and State laws enumer-
ated above. Indeed, in a nationally-advertised and
distributed tax service, the publishers issued a spe-
cial brochure to their clients. In it, suggestions were
made concerning considerable tax savings to be ef-
fectuated by subtracting sufficient control in given
situations, thereby converting an employment rela-
tionship into an independent contractorship. Illus-
trations were provided. Even if cases of deliberate
manipulation may be relatively infrequent, there un-
questionably are innumerable examples of 'evasion
by nomenclature.' Such instances, made possible by
mechanical application of 'control' criteria, are man-
ifestly unfair to workers who are thereby deprived
of various statutory benefits which they were sched-
uled to enjoy. Obviously, such situations are con-
trary to public policy." (3 DePaul L R, pp 32, 33.)

This distorted and foreign test, "control," then,
lacking definite meaning, lends itself readily both to
absurd results and to easy evasion. As a result, as
noted, the cases are in a chaotic condition. It is
obvious that a test which has so signally failed to

achieve either uniformity or certainty is no test in any acceptable sense of the word. I accordingly reject it as such. It is not as clear to me, moreover, as it seems to Mr. Justice Boyles, that our Michigan law justifies the application of the control test in the relationship here under examination. The earlier Michigan cases were clear to the point that the unemployment compensation (now employment security) act "furnishes its own test" for the employment relationship and that common-law principles do not control. *O'Brian* v. *Unemployment Compensation Commission,* 309 Mich 18. The amendment of the act in 1943 changed its provisions as to definition of services rendered (PA 1943, No 246) but we find nothing in such amendment to justify an abandonment of the principle that the act furnishes its own test of employment. See, also, in this regard, *Nordman* v. *Calhoun,* 332 Mich 460, 465. The test to be used is not expressly stated, as such. It must, as hereafter pointed out, be found in the purposes of the act. The attempt, incidentally, to solve the problem of who is an employee for the purposes of the act by differentiating between "services" and the "finished product" (*Michigan Bulb Co.* v. *Unemployment Compensation Commission, supra*) merely rephrases our problem. No solution can be found in this verbal device, for a finished product does not burst into being full-grown, an Athena from the mind of Zeus. It is normally the product of services of some kind. The question always remains whether the services were rendered in employment, by a servant, or whether they were rendered in the course of the performance of a contract by an independent businessman.

Were I to attempt to apply the control test, however, I can find nothing in the case but complete control. The referee's findings of facts (adopted by the appeal board as its own) states as follows:

"The testimony in the instant case clearly established that appellant had control over the activities of the outside retoucher. The contract of hire called for the personal service of the retoucher; they were required to complete the assignment within 7 days, unless granted an extension by appellant; the work had to be performed 'according to our (appellant's) standards;' appellant withheld a portion of the moneys due to them to take care of defective workmanship the lastly on the question of control the evidence disclosed that the retouchers have no investment in the facilities used in connection with their work; that their services are a part of a continuing relationship with appellant and not in the nature of a single transaction; and that, appellant may terminate the relationship at will."

On these facts (even were control the test) I cannot agree with Mr. Justice Boyles that there is not enough here to establish the right of the plaintiffs to control the acts of Rebecca Cohen. It is difficult to imagine a case of more abject economic subjection than that of the industrial homeworker, Rebecca Cohen, described in detail herein. We find not only all of the control required or permitted by the nature of the work but also the right to fire at any time. As any worker knows, the hand that holds the pay check wields also the whip of discipline. An error, an infraction of the rules, and the job may be only a memory. To assert "independence" under such circumstances is to make a play on words, reaching a result completely divorced from the realities of life. To say that these forms of control may also be applied to an "independent contractor" is merely to destroy his independence, to demonstrate his integration with the larger economic machine. It is unnecessary to stress that the ruling of the United States treasury department, made in response to appellants' request, does not control our determination upon these facts. I agree with my Brother that it is not

necessary to pass upon the impact of the Federal act on the question here presented.

What is the proper test for application? We turn to the act itself to discover its purposes, the mischiefs it was designed to cure. We find that:

"Sec. 2. The legislature acting in the exercise of the police power of the State declares that the public policy of the State is as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this State. Involuntary unemployment is a subject of general interest and concern which requires action by the legislature to prevent its spread and to lighten its burden which so often falls with crushing force upon the unemployed worker and his family, to the detriment of the welfare of the people of this State. Social security requires protection against this hazard of our economic life. Employers should be encouraged to provide stable employment. The systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment by the setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own, thus maintaining purchasing power and limiting the serious social consequences of relief assistance, is for the public good, and the general welfare of the people of this State." (CL 1948, § 421.2 [Stat Ann 1950 Rev § 17.502].)

The words of the Pennsylvania court, used with respect to substantially similar language in the act of that State, well expresses the intent of such acts and the proper standards for their interpretation:

"Having in mind the broad purposes of this unemployment compensation legislation as expressed in the preamble to the act, it is our opinion that it was the intention of the legislature to provide for a larger coverage of employees entitled to unemployment compensation than merely those who would be

considered employees under the common law, and to include, as it expressly states, 'all service performed for remuneration,' subject only to the exceptions specified in other provisions of the act hereinafter referred to." *Department of Labor and Industry* v. *Aluminum Cooking Utensil Co.,* 368 Pa 276, 280 (82 A2d 897).

Tested by the policies and objectives above enunciated, the confused test of control is largely meaningless. Whether one is controlled in his movements by his employer or not has no relevance to his needs for unemployment compensation. The minutely controlled worker at the elbow of the boss, and the salesman on the road a thousand miles from the plant, each dependent on his job, suffer equally when the business is forced to close its doors. It is clear to me that the degree of control exercised over these 2 men neither reduces nor emphasizes the risk that he will lose his job in bad times or his family's distress subsequent to the economic tragedy. See discussion of Willcox, 8 Vanderbilt L R 245, "The Coverage of Unemployment Compensation Laws."

We are not without additional aid in our research. The supreme court of the United States has given the question before us the most careful examination. In *United States* v. *Silk, supra,* 713, the court held as follows with respect to the problem before us:

"The problem of differentiating between employee and an independent contractor, or between an agent and an independent contractor, has given difficulty through the years before social legislation multiplied its importance. When the matter arose in the administration of the national labor relations act, we pointed out that the legal standards to fix responsibility for acts of servants, employees or agents had not been reduced to such certainty that it could be said there was 'some simple, uniform and easily applicable test.' The word 'employee,' we said, was

not there used as a word of art, and its content in its context was a Federal problem to be construed 'in the light of the mischief to be corrected and the end to be attained.' We concluded that, since that end was the elimination of labor disputes and industrial strife, 'employees' included workers who were such as a matter of economic reality. The aim of the act was to remedy the inequality of bargaining power in controversies over wages, hours and working conditions. We rejected the test of the 'technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants.' This is often referred to as power of control, whether exercised or not, over the manner of performing service to the industry. 2 Restatement, Agency, § 220. We approved the statement of the national labor relations board that 'the primary consideration in the determination of the applicability of the statutory definition is whether effectuation of the declared policy and purposes of the act comprehend securing to the individual the rights guaranteed and protection afforded by the act.' *National Labor Relations Board* v. *Hearst Publications, Inc.,* 322 US 111, 120, 123, 124, 128, 129, 131 (64 S Ct 851, 88 L ed 1170)."

The test employed is one of economic reality. It looks at the task performed, whether or not it is a part of a larger common task, "a contribution to the accomplishment of a common objective." *Rutherford Food Corp.* v. *McComb,* 331 US 722 (67 S Ct 1473, 91 L ed 1772), quoting *Walling* v. *Rutherford Food Corporation* (CCA), 156 F2d 513, 516, 517. The test is far from the common-law test of control, since "the act concerns itself with the correction of economic evils through remedies which were unknown at the common law." (*Id.* 727.) The test, rather, looks at the workmen, to see whether or not their work can be characterized "as a part of the integrated unit of production," (*Id.* 729) and whether "the work done, in its essence, follows the usual path of an em-

ployee." (*Id.* 729.)   In applying such test, control is only one of many factors to be considered.   The ultimate question is whether or not the relationship is of the type to be protected.   This is a matter of fact, not of terminology.   The laborer with shovel in hand remains an employee even though the employer, under the spur of tax or other liability, solemnly recites to him a legal jingle: "I no longer control you.   Shovel according to your own methods.   I hold you responsible only for the ultimate result, a pile of coal.   You render me no shoveling services, but you rather sell me a product: a pile of coal from an emptied car."   Likewise the typist on her machine undergoes no transformation into an independent businesswoman because her employer tells her that she can choose her own methods of working, *i.e.,* type with 2 fingers or 10.

Tested by those standards, Rebecca Cohen was clearly an employee.   Her work, in essence, followed the usual path of an employee.   It was an integral part of her employers' business.   It was a contribution to the common objective.   And if "control" remains the test, it is clear that her employers exercised over her all of the control her work demanded.

The award should be affirmed.   Costs to appellees.

BLACK, J., took no part in the decision of this case.