FOSTER *v.* EMPLOYMENT SECURITY COMMISSION

1. UNEMPLOYMENT COMPENSATION—EMPLOY—TEST OF EMPLOYMENT —COMMON-LAW RULES.
   The common-law rules concerning the master-servant relationship do not provide the controlling tests as to whether one is in the employ of another under the employment security act (MCLA, § 421.42).

2. SAME—EMPLOYMENT—TEST OF EMPLOYMENT—STATUTE.
   The statement in subsection 6 of § 42 of the employment security act that an individual is not in the employment of another unless he is "under the employer's control or direction as to the performance of his services both under his contract for hire and in fact" states the governing test for determining whether an individual is in the employment of another for the purposes of that act, superseding the common-law right-to-control, whether or not exercised, test (MCLA, § 421.42).

3. SAME—EMPLOYMENT—TEST OF EMPLOYMENT—STATUTE.
   The meaning of the statement in subsection 6 of § 42 of the employment security act that an individual is not in the employment of another unless he is "under the employer's control or direction as to the performance of his services both under his contract for hire and in fact" is to be determined in light of the objectives sought to be achieved by the enactment of this legislation (MCLA, § 421.42).

---

REFERENCES FOR POINTS IN HEADNOTES

[1–9] 48 Am Jur, Social Security, Unemployment Insurance and Retirement Funds § 15 *et seq.*

[10, 11] 48 Am Jur, Social Security, Unemployment Insurance and Retirement Funds § 49.

4. SAME—EMPLOYMENT—QUESTION OF FACT.

Whether in a particular case the dominance by one contracting party of another justifies or requires a finding that the dominated party is an employee and the dominating party his employer and the relationship one of employment under the Michigan employment security act requires an interpretation of the total factual situation and cannot be resolved by applying traditional concepts of the law of agency, contracts and torts.

5. SAME—EMPLOYMENT—CONTROL—FORMAL ORDERS.

Control or direction of performance, and thus an employer-employee relation, can exist immediately upon the assignment of a task without the necessity of formal order as to how the task is to be accomplished.

6. SAME—EMPLOYMENT—FACTS—BURDEN OF PROOF.

While, as a general proposition, the burden of proof is on the proponent, that principle is not universal; in a proceeding by the Employment Security Commission to recover employment security taxes where the facts are peculiarly within the knowledge and control of the employer, the burden becomes his to produce competent and convincing evidence concerning the matter.

7. SAME—EMPLOYMENT—CONTROL—LEASE OF TAXICABS.

An inference that men who drove plaintiff's taxicabs, under an arrangement in which any person who had the required license could "lease" one of plaintiff's cabs for 12 hours, was not obligated to take any calls, work any set area, or put in the full 12 hours at work, could begin the 12-hour lease period any time he chose, day or night, and was compensated by being paid 40% of his fares plus fuel and other expenses, while plaintiff got the rest, were employees of plaintiff *held,* a permissible inference where there was evidence that many of the drivers had no other business or source of income, that they had no capital invested in the taxi business, and that the natural inclination to increase their revenues motivated them to accept plaintiff's radio calls and in other ways put themselves under his control.

8. SAME—EMPLOYMENT—TEST OF EMPLOYMENT—QUESTION OF FACT.

There can be no universal test of what does or does not constitute an employment relationship; the question must be one of judgment based on particularized facts and circumstances of the individual case.

9. SAME—EMPLOYMENT—TAXATION.

Control or direction in performance can be implicit, and an employer should not be able to avoid the impact of the unemployment compensation statute, and his employees should not be denied its benefits, merely because the structure of the industry and its method of operation permit the employer to operate without giving orders in the conventional sense.

10. SAME—APPEAL BOARD—APPEAL AND ERROR—SCOPE OF REVIEW.

It is the function of the employment security's appeal board to draw inferences, and it is not the function of the Court of Appeals to do so; the task of the Court of Appeals is simply to determine whether the appeal board's inferences and findings are supported by the evidence.

11. SAME — APPEAL BOARD — TEST OF EMPLOYMENT — PROCEDURE — APPEAL AND ERROR.

Proceeding in which employment security commission appeal board held that taxi drivers who drove plaintiff's taxis were his employees, but made no finding as to whether such drivers followed a pattern of operation established by plaintiff and were controlled or directed by him in the performance of their work, having applied the common-law test of right to control, whether or not in fact exercised, rather than the statutory test of being under the employer's control or direction in the performance of their services both under the contract for hire and in fact *held,* required to be remanded to the appeal board for further proceedings consistent with the statutory test.

Appeal from Wayne, Fitzgerald (Neal), J. Submitted Division 1 June 7, 1967, at Detroit. (Docket No. 2,892.) Decided December 23, 1968. Rehearing denied February 21, 1969.

Complaint by Vern Foster against Michigan Employment Security Commission for an order of superintending control and for a determination that a certain finding of the Michigan Employment Security appeal board is erroneous. Judgment for plaintiff. Defendant appeals. Reversed and remanded to employment security appeal board.

*Smith, Ryan, Simmons & Jones (C. Charles Bokos,* of counsel), for plaintiff.

*Frank J. Kelley,* Attorney General and *George M. Blaty,* Assistant Attorney General, for defendant.

LEVIN, J.    This proceeding was commenced by the Michigan employment security commission to recover employment security taxes.

The MESC now appeals a judgment of the circuit court reversing a decision of the employment security appeal board.    The appeal board had found that individuals who "leased" and operated taxicabs owned by appellee Vern Foster rendered services in Foster's "employment" within the meaning of § 42 of the Michigan employment security act (PA 1936 [Ex Sess], No 1 [MCLA, § 421.42; Stat Ann 1960 Rev § 17.545]).

The written opinions of both the appeal board and the circuit judge stated that in deciding whether the taxicab drivers rendered services in Foster's "employment" they applied the test of right to control, whether or not exercised.    This is essentially a common-law test.    It is the test last enunciated in an employment security case by the Michigan Supreme Court in *Powell* v. *Employment Security Commission* (1956), 345 Mich 455, Mr. Justice TALBOT SMITH dissenting.[1]

Subsequently in *Tata* v. *Muskovitz* (1959), 354 Mich 695, 699, a majority of the Supreme Court agreed to establish Justice SMITH's dissenting opinion in *Powell* "as proper guide to relevant interpre-

[1] See, also, Justice SMITH's dissenting opinions in *Pazan* v. *Unemployment Compensation Commission* (1955), 343 Mich 587, 592, and in *R. H. McManus Company* v. *Employment Security Commission* (1956), 345 Mich 167, 174.

tation of the *workmen's compensation law.*" (Emphasis supplied.) More recently in *Goodchild* v. *Erickson* (1965), 375 Mich 289, 293, another workmen's compensation case, the majority of the Court, relying on *Tata* v. *Muskovitz, supra,* declared:

"We have, however, abandoned the control test as the exclusive criterion by which the existence of an employee-employer relationship, for the purposes of remedial social legislation, is determined."

Then our Court, in reliance on *Tata* v. *Muskovitz, supra,* and *Goodchild* v. *Erickson, supra,* ruled that by adoption of Justice SMITH's *Powell* dissent "our Supreme Court has abrogated the use of the common-law definition of 'control' in interpreting social legislation, which we hold includes employment security legislation as well as workmen's compensation legislation," and then went on to apply Justice SMITH's reasoning in affirming a decision of the employment security appeal board. *Industro-Motive Corporation* v. *Wilke* (1967), 6 Mich App 708.

In adopting the concepts expressed in the *Powell* dissent our Court did not mean to, nor could it, read out of § 42 of the employment security act the definition of the term "employment" added as subsection 6 after Justice SMITH's dissent in *Powell*.[2] Subsection 6 declares that an individual is not in the employment of another unless he is "under the employer's control or direction as to the performance of his services both under his contract for hire and in fact."[3]

---

[2] At the time of the *Powell* decision the employment security act, like the workmen's compensation act (PA 1912 [1st Ex Sess], No 10, as amended; MCLA, § 411.7 [Stat Ann 1968 Cum Supp § 17-.147]), contained no language comparable to subsection 6 added to § 42 of the employment security act in 1957 (PA 1957, No 311). See footnote 3 for history of subsection 6.

[3] The original statutory definition of employment enacted in 1936 (PA 1936 [Ex Sess], No 1, § 42) read:

*Industro-Motive* adopted the philosophy and reasoning of Justice SMITH's dissent as a sound approach to the construction of the words "control or direction as to the performance" in this statute.

The *Powell* dissent demonstrated that whether in a particular case the dominance by one contracting party of another justifies or requires a finding that the dominated party is an employee and the dominating party his employer and their relationship one of employment requires an interpretation of the total factual situation and cannot be resolved by applying traditional concepts of the law of agency, contracts and torts.

It would perhaps have been better if the legislature had left the matter at large without reintroducing the word "control" to the statutory definition[4]

"Sec 42(1). Subject to the other provisions of this section 'employment' means service, including service in interstate commerce, performed for remuneration or under any contract of hire, written or oral, express or implied. * * *

"(4) Services performed by an individual for remuneration shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the commission that

"(a) Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and

"(b) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

"(c) Such individual is customarily engaged in an independently established trade, occupation, profession, or business." Subsection (4), renumbered subsection 6 by PA 1937, No 347, was repealed by PA 1943, No 246, leaving the matter, except for subsection 1, at large for definition by the commission, the appeal board and the courts until PA 1957, No 311 added:

"(6) Services performed by an individual for remuneration shall not be deemed to be employment subject to this act, unless such individual is under the employer's control or direction as to the performance of his services both under his contract of hire or in fact."

4 "One of its [the control test's] many difficulties is that this test, so borrowed from the law of torts, is capable of producing any result, of rationalizing any fact situation, depending upon whether we use the word 'control' to mean peremptory order, request, command, direction, suggestion, implication, or other shade of meaning in the transmission of will, wish, or desire, whether these elements

with the inevitable tendency, as shown by the opinions of both the appeal board and the circuit court, of the common-law imagery again to come to the fore.[5]

Be that as it may, the words "control or direction" are now back in the statute. Those words first appeared in the original 1936 act, together with other definitional language, as subsection 4 of § 42; in 1943 the subsection was repealed. See footnote 3 for the statutory history.

In cases governed by the original statutory definition of "employment," the Michigan Supreme Court declared that the common-law rules concerning the master-servant relationship do not provide the controlling test as to whether one is in the employ of another under the employment security act.

"The statutory provisions in the act must be held to supply the test." *Acme Messenger Service Co.* v. *Unemployment Compensation Commission* (1943), 306 Mich 704, 709, followed in *Graystone Ballroom, Inc.* v. *Baggott* (1947), 319 Mich 87, 93; *O'Brian* v. *Michigan Unemployment Compensation Commission* (1944), 309 Mich 18, 22.

During the period (1943–1957) when the only definition of "employment" was that set forth in sub-

---

must be express, or need only be implied, in fact or law, and whether an unexercised 'right' as to them is sufficient. * * *

"But the control test reaches its lowest level of futility when it is employed in those cases in which no control is possible from the very nature of the work." *Powell* v. *Employment Security Commission, supra,* per Mr. Justice SMITH dissenting, pp 471, 472.

"As applied to today's complex economy of the assembly line, of dispersed industrial operations, of concentrated operations but with semi-autonomous 'departments' or branches, and of general contractors who, in turn, employ subcontractors and sub-subcontractors, the 'control' test is often meaningless, usually ambiguous, and always susceptible of paperwriting evasions." *Schulte* v. *American Box Board Company* (1959), 358 Mich 21, 32, 33, Mr. Justice TALBOT SMITH concurring.

[5] The attorney general's brief in this case also argues that the statute adopts the common law concepts of master and servant relationship in determining what constitutes employment.

section 1 of § 42 (see footnote 3), the Court again stated that the statutory language supplies the test of whether an individual is an employee. *Nordman v. Calhoun* (1952), 332 Mich 460, 465, favorably citing the cases cited in the immediately preceding paragraph of this opinion.

*Industro-Motive* says the same thing—the common law tests do not control. The meaning of the present statutory definition is to be determined in light of the objectives sought to be achieved by the enactment of this legislation.

Control or direction of performance frequently will exist immediately upon assignment of the task without formal orders as to the means by which it is to be accomplished simply because there is no need to be more specific. As the *Powell* dissent pointed out, the coal shoveler does not become an independent businessman merely because his employer does not tell him at which end of the pile to begin shoveling, and the typist does not become an independent businesswoman merely because her employer has not directed her to use all 10 fingers rather than to hunt and peck with 2. A similar concept was expressed by a unanimous Court in *Nordman* v. *Calhoun, supra,* an employment security act case (p 466):

"The fact that the employer did not find it necessary to exercise any detailed supervision over the performance of the employee's duties is not determinative of the employer-employee relationship, nor does the fact that [the employee] was a part-time employee bring him within the exception found in the act."

Foster owned 5 to 10 cabs during the tax years 1961, 1962 and 1963. The relationship between Foster and his drivers was informal. Anyone with a city of Livonia hack license could drive one of

his cabs. There was no agreed-upon schedule of work although some men who drove regularly came in at fairly predictable hours. According to Foster, whoever came in the door first, whether a regular driver or previously unknown driver, as long as he was a licensed hack driver, had priority for the next available cab.[6]

When the driver came in the door he was expected to show his hack license and to put down a $10 returnable deposit, whereupon he obtained the next available cab. Foster provided a cab in clean condition, the motor oiled. The oral understanding between Foster and the drivers, characterized by Foster at the hearing as a "lease," was that the cab would be returned within 12 hours in the same condition. The driver was not required to keep the cab for the full 12 hours. Foster paid for gas and oil out of his 60% share of the meter proceeds. The driver retained the remaining 40%.

There was no prescribed uniform or dress. The use of alcoholic beverages during the lease period was prohibited. The meter rates were set by the city, which also required that drivers write up and turn in a trip sheet detailing each run. There was

6 The appeal board found:

"The driver determined what shift he wanted to work, and on what schedule of hours; the first driver to report to the cab company secured the preference, both as to the vehicle and as to his shift."

How meaningful this priority was in practice does not appear. The record does not show to what extent regular drivers in fact took a back seat to sporadic drivers in the assignment of cars. The record is also silent as to the number of drivers who drove regularly and the number who drove sporadically and the extent of the competition by sporadic drivers with regular drivers for cabs.

Foster testified that a number of his drivers came in at fairly predictable times of their own choice every morning: "I have somebody who comes in at 8 o'clock, 9 o'clock, 10 o'clock, noon, 3 in the afternoon, whatever their fancy suits." This would support an inference that they expected to find a car when they came in at those hours and most times did find a car at the hour they came in, that the practice of giving the car to the first driver who came in the door did not interfere with the expectations of the regular drivers to such an extent as to make them irregular drivers.

a minimum charge for "leasing" the cab of $3. Foster could not recall ever having collected the $3 minimum as such, his 60% share always exceeding that amount.

The appeal board found that Foster "did not give orders to the drivers while the driver had the vehicle out on lease." It also found that he did not "field check the driver as to what he was doing with the vehicle."[7]

Foster could not object if the driver took out a vehicle belonging to another taxicab company the following day.[8]

Driving Foster's cabs was the only source of income to a "good number" of the drivers. For a "great many," driving his cabs represented an additional source of income.

Foster maintained a considerable number of listings in the telephone book under different names all leading to fundamentally the same group of telephones, which were answered by members of his family and himself 24 hours a day. Drivers were not "specifically required" to keep the radios in their cabs turned on. A driver "could" come in, lease a taxicab and work the local race track all day long without using the radio at all.

Although not compelled to do so, drivers had the privilege of using taxi stands established at shop-

[7] Worth noting is Foster's response when asked whether he checked on the drivers when he himself was driving a cab. He said: "There is no particular need for such a thing."

[8] Foster argues that since any driver could work for a competitor the following day this shows there wasn't the kind of loyalty that one would expect in an employer-employee relationship. Without needlessly passing on the question of whether loyalty is a requisite element, or to what extent its absence affects the matter, there is nothing on this record to show that any driver who worked for Foster did in fact shuttle back and forth between Foster and his competitors. For all that appears, drivers who drove for Foster did not in fact drive for anyone else during the period they were driving for Foster.

ping centers, bus stops and other trafficked locations. There was a telephone box at each station by means of which Foster informed drivers of available business. When not on a run or covering a special event, the drivers "gravitated" to the cab stands.

Foster testified that drivers had refused radio calls, but the record does not show whether such refusals were by random or regular drivers or how frequently they occurred. Nor does the record show whether any driver made it a practice to keep his radio turned off, except when covering a special event, or the extent of any such practice.

As to the paucity of the record in certain critical areas, we note that, while as a general proposition the burden of proof is on the proponent, that principle is not universal. In this case only Foster and an MESC employee testified. It has been said that where the facts are peculiarly within the knowledge and control of the employer, the burden becomes his to produce competent and convincing evidence concerning the matter. *Michigan Tool Company* v. *Employment Security Commission* (1956), 346 Mich 673, 679.

In our opinion, the loose, in some cases temporary, relationship between Foster and his drivers was not necessarily inconsistent with the appeal board's finding that the drivers were in his employ. None of the drivers was established in a business venture of his own. They had no capital invested in the taxi business. They worked Foster's cabs.

The facts that the drivers were not established in independent businesses of their own, that their work consisted of putting to productive use Foster's cabs and that their use of his cabs was in Foster's business of serving the public suggest that whatever the form of the relationship, it was in substance and reality an employment by Foster of the drivers,

However, those facts, while they point to a finding of employment, should not be held as a matter of law to constitute employment. The lesson of experience is that we should not attempt to contrive a talismanic test. All such efforts have failed. We are not likely to be more successful. In the last analysis, in any sound analysis, the question becomes one of judgment based on the particularized facts and circumstances of the individual case.

Since the drivers earn their income on a "piecework" basis, there was probably little or no need to direct them to listen to the radio or to take calls. Foster's tesitmony: "The only compulsion would be their desire for profit, or their desire for money" illustrates the lack of need for formalized "control or direction" in performance. He had a built-in Pavlovian reaction—car with radio plus percentage of the gross take equals use of radio and responding to calls.

An employer should not be able to avoid the impact of the statute, his employees should not be denied its benefits, just because the structure of the industry and its method of operation permit the employer to operate without giving orders in the conventional sense. This does not mean that control or direction in performance need not be shown, but rather that control or direction in performance can be implicit if the nature of the business is such that all the control the employer needs and desires to exercise can be effected by establishing a certain pattern of operation and engaging persons to participate therein knowing that if they respond normally they will conform to the established, workable and profitable pattern.

Whether this was true in this case depends upon an interpretation of the facts. The critical question is whether the drivers *whose wages it is sought to*

*tax* did conform to the employer's pattern by leaving their radios on, taking radio calls, and gravitating to the cab stands where they could obtain telephone calls. Whether they did so depends upon the inferences that one wishes to draw from this record. We think it an entirely permissible inference that most of the drivers did just that.

The defendant would not have advertised in the telephone book under 9 separate listings if he did not expect to get telephone calls and did not anticipate that most drivers could be depended upon to take them when radioed out. Nor do we think it likely that Foster would have kept someone on duty to answer the telephone 24 hours a day unless there were drivers operating cabs with radios on who would respond to a radioed call. The patronage of those who telephoned would soon be lost to a competitor unless their telephoned calls produced prompt service.

However, while we think all the foregoing would be fair inferences, we do not think we should draw such permissible inferences even though doing so would enable us to affirm the appeal board's decision. The appeal board, while finding the drivers were in Foster's employ, made no explicit finding as to whether the men did in fact follow a pattern of operation established by Foster and were controlled or directed by him in the performance of their work. It is the function of the appeal board to draw inferences, not ours. Our task is simply to determine whether the appeal board's inferences and findings are supported by the evidence.[9]

There are other reasons why we should remand this case rather than simply affirm the appeal board.

[9] The precise reviewing standard is set forth in § 38 of the act, as last amended by PA 1967, No 254 (MCLA, 1967 Cum Supp § 421.38; Stat Ann 1968 Cum Supp § 17.540).

The appeal board applied an incorrect test, the essentially common law test of *right* to control, whether in fact exercised, rather than the statutory standard. On remand the appeal board might conclude upon applying the statutory standard that some of Foster's drivers were not in his employ. The appeal board might view a driver who takes a cab on a free-lance basis and cruises without any radio or other contact with Foster's office as neither controlled nor directed. Such a finding would not necessarily be reversed on any further appeal. We intimate no opinion thereon.

We note that the only witnesses who testified at the hearing were a field adviser of the MESC and Mr. Foster himself, that none of the drivers were called. It may be that further testimony from Mr. Foster and from drivers or others might cast light on some of the matters mentioned in this opinion. Accordingly, on the remand herein ordered, either party shall have the right to offer additional evidence.

Reversed and remanded to the appeal board for proceedings consistent with this opinion. We do not retain jurisdiction. No costs.

FITZGERALD, P. J., and MCGREGOR, J. concurred.