*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

YOUSIF GORGIS,

        Plaintiff-Appellee,

v

AUTO CLUB INSURANCE ASSOCIATION, doing
business as AAA OF MICHIGAN, and
MEMBERSELECT INSURANCE COMPANY

        Defendants-Appellants,

and

CAROLINA CASUALTY INSURANCE
COMPANY,

        Defendant-Appellee,

and

WESCO INSURANCE COMPANY and
MACKINAW ADMINISTRATORS, LLC,

        Defendants.

FOR PUBLICATION
June 22, 2026
8:58 AM

No. 375123
Wayne Circuit Court
LC No. 23-011848-NF

Before: YOUNG, P.J., and BORRELLO and TREBILCOCK, JJ.

BORRELLO, J.

    In this priority dispute under Michigan's no-fault act, MCL 500.3101 *et seq*., defendant
Auto Club Insurance Association (d/b/a AAA of Michigan) (AAA)[1] appeals by delayed leave

---

[1] The relationship between AAA and defendant MemberSelect Insurance Company is not exactly
clear from the record, but they appear to be aligned in interest. AAA and MemberSelect filed a
joint brief on appeal and refer to these two entities collectively in the brief. Accordingly, we will

granted[2] the trial court's order granting summary disposition in favor of defendant Carolina Casualty Insurance Company (Carolina) and holding that AAA was first in priority in this no-fault claim. For the reasons set forth in this opinion, we reverse and remand for entry of an order granting summary disposition in favor of AAA and holding that Carolina is first in priority under MCL 500.3114(3).

## I. BACKGROUND

This appeal stems from a motor vehicle accident that occurred on September 14, 2022. On that date, plaintiff, acting as a truck driver on behalf of Transport Systems, was engaged in the interstate transportation of auto parts. The truck in question was owned by Syed,[3]one of the principal owners of Transport Systems. While operating this truck from Michigan to Kansas, plaintiff's truck collided with a deer in Missouri between 9:30 p.m. and 10:30 p.m. The conditions at the time were dark but clear. Plaintiff was traveling at the posted speed limit of 65 miles per hour and asserts he was unable to avoid the collision. As a result, plaintiff claims injuries to his back, hands, and neck. There is no dispute that the vehicle was insured under a policy issued by Carolina. Additionally, plaintiff and his spouse maintained separate AAA insurance policies covering their personal vehicles.

On September 13, 2023, plaintiff initiated this action against several insurance carriers, including AAA and Carolina, seeking recovery of no-fault benefits. Carolina subsequently moved for summary disposition and dismissal pursuant to MCR 2.116(C)(8) and (C)(10), asserting that plaintiff operated as an independent contractor rather than an employee of Transport Systems. Accordingly, Carolina maintained that plaintiff was not eligible for benefits under Transport Systems' policy, in accordance with MCL 500.3114(3).

During his deposition, plaintiff provided testimony regarding the nature of his engagement with Transport Systems. He commenced driving for Transport Systems in July 2021, having responded to an advertisement for drivers. Plaintiff completed an application and underwent orientation prior to beginning his assignments. He received individual job assignments or "loads" from a dispatcher, who would contact him directly; if plaintiff agreed to accept an assignment, he would receive additional details via text message. While plaintiff retained the discretion to accept or decline assignments, he indicated that there was implicit pressure to accept loads during periods of high demand. Plaintiff did not have a fixed schedule but generally worked six days per week, exclusively for Transport Systems. The dispatcher provided specific times and locations for load pickups.

---

simply use "AAA" to refer to these entities collectively merely for the sake of convenience and without implying any conclusion about their formal relationship.

[2] *Gorgis v Auto Club Ins Ass'n*, unpublished order of the Court of Appeals, entered September 23, 2025 (Docket No. 375123).

[3] Syed's identity was not disclosed by surname.

Plaintiff received compensation from Transport Systems on a weekly basis, calculated according to the specific loads completed. Assignments varied, with plaintiff sometimes completing two round-trip loads between Michigan and Kansas per week, or alternatively, a single trip to Texas and back. Additional routes included Michigan to Ohio and Ohio to Kansas, culminating in return trips to Michigan. Plaintiff's remuneration fluctuated depending on destinations but was not calculated on a per-mile basis. Compensation was reported on a Form 1099, and Transport Systems did not withhold taxes on plaintiff's behalf.[4] While plaintiff did not receive traditional paystubs, he was provided with statements itemizing both the amounts earned per load and deductions for contributions toward fuel, tolls, weigh station fees, and highway taxes. Payment was deposited into an account held by Gorgis Trucking—a company owned by plaintiff's brother—which subsequently disbursed plaintiff's wages. When questioned about his status with Gorgis Trucking, plaintiff indicated that he was its sole driver.

Plaintiff further testified that Transport Systems did not issue an employee handbook or general policy documents to guide his work, nor was he required to adhere to prescribed routes. Nevertheless, informational documents pertaining to specific deliveries were provided with each assignment. The cost of fuel was divided evenly between plaintiff and Transport Systems. Plaintiff stated that there was no written contract governing his employment, aside from the completed application. He was not responsible for vehicle repairs but was required to contribute 50% toward weigh station fees, highway taxes, and tools. No uniforms were issued, and there were no requirements regarding attire.

Upon attempting to resume work with Transport Systems, plaintiff was informed that his services were no longer required. Plaintiff testified that he was presented with a termination document, which he declined to sign. Transport Systems sought to hold plaintiff financially responsible for repairs to the truck, a demand plaintiff refused. The stated rationale for his termination was that this incident constituted his second deer-related accident while under Transport Systems' engagement. Plaintiff reported no prior disciplinary actions during his tenure.

Transport Systems did not provide plaintiff with a cell phone. At the time of the accident, plaintiff had his own cell phone that was in his name, and he paid the entire bill without receiving any reimbursement from Transport Systems. Plaintiff always drove the same truck or tractor, but the trailer would change from load to load. Transport Systems owned the trailers. There was an application called "Keep Trucking" that Transport Systems loaded onto plaintiff's personal cell phone to maintain plaintiff's driving log. Transport Systems did not permit the use of a different application for this purpose. Transport Systems did not provide any training to plaintiff. While transporting a load, plaintiff oversaw choosing his restroom and meal stops. Transport Systems did not provide plaintiff with health insurance or workers' compensation insurance.

Plaintiff also testified that he could not have transported a load for a different company because he was "with" Transport Systems and would have had to quit working for Transport Systems to drive for a different company due to the nature of his schedule and mode of receiving

---

[4] In addition to his income as a truck driver, plaintiff had additional income from a rental property.

assignments from Transport Systems. Plaintiff explained that although he could decline assignments from Transport Systems, "they don't like it when we keep refusing."

The record also contains Transport System's "Independent Contractor Waiver of Coverage," which bears plaintiff's name and a signature. It is dated January 11, 2022. The waiver states in relevant part:

> I am an independent contractor, with no employees, no . . . laborers, and no sub-contractors performing work for Transport Systems, LLC . . . .
>
> I am not the employee of Transport Systems, LLC for worker's compensation purposes, and therefore, I am not [entitled] to workers' compensation benefits under their policy coverage. I waive any and all rights to file any claim against said employer in the event an accident should occur while I am performing work on their premises, truck, trailer from start of the agreed contract [un]till the termination of the agreement.
>
> I have elected NOT to participate in the provided occupational accident death and dismemberment coverage offered to me by Transport Systems, LLC. [] I have been made CLEARLY aware of the RISK AND LIABILITY.

During his deposition, plaintiff testified that he had not previously seen the document in question and stated that the signature thereon was "very similar to my signature but it's not exactly." Plaintiff further testified: "At the time Syed informed me about [this document], he told me, 'You already have Medicaid, you don't need this [insurance],' but he did not provide any further explanation." Plaintiff believed himself to be an employee of Transport Systems.

AAA opposed Carolina's motion for summary disposition. AAA contended that, pursuant to MCL 500.3114(3), an employee who sustains an accidental injury while occupying a motor vehicle owned by the employer is required to seek personal protection insurance (PIP) benefits from the insurer of the employer-furnished vehicle. AAA asserted that Syed, an owner of Transport Systems, owned the vehicle operated by plaintiff at the time of the accident, and that Carolina, as the insurer of that vehicle, was therefore first in priority. AAA further maintained that plaintiff was operating the vehicle within the scope of his employment, and that the statutory scheme does not require the entity that procured insurance (i.e., Transport Systems) to be the identical entity employing the injured party. Accordingly, AAA argued that even if plaintiff were deemed an independent contractor with respect to Transport Systems, as Carolina asserted, such status would not exclude Carolina from the order of priority. AAA further argued that plaintiff could be considered an "employee" for purposes of the no-fault act by virtue of being self-employed. Alternatively, AAA maintained that plaintiff was an "employee" of Transport Systems under the economic reality test and emphasized that an individual may be classified as a 1099 worker for tax purposes while simultaneously qualifying as an "employee" for purposes of the no-fault act.

The trial court conducted a hearing and granted Carolina's motion for summary disposition. The court applied the economic reality test and concluded that plaintiff was an independent contractor and not an employee of Transport Systems at the time of the accident for purposes of

MCL 500.3114(3). Defendants Wesco Insurance Company and Mackinaw Administrators were also granted summary disposition and dismissed from the action. The trial court denied AAA's motion for reconsideration. This Court subsequently granted leave to appeal.

## II. STANDARD OF REVIEW

A trial court's summary disposition ruling is reviewed de novo on appeal. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). Although Carolina cited both MCR 2.116(C)(8) and (C)(10) in its motion, the trial court clearly relied on the parties' documentary evidence and did not rely solely on the pleadings. It is thus clear that the trial court granted Carolina's motion under (C)(10). See *Hughes v Region VII Area Agency on Aging*, 277 Mich App 268, 273; 744 NW2d 10 (2007) ("[W]here, as here, the trial court considered material outside the pleadings, this Court will construe the motion as having been granted pursuant to MCR 2.116(C)(10).").

Summary disposition under MCR 2.116(C)(10) is proper when "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." Such a motion may only be granted if, considering all the evidence in the light most favorable to the opposing party, there is no genuine issue of material fact. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id*. (quotation marks and citation omitted).

Resolution of the present appeal also involves the interpretation and application of statutes in the no-fault act. This Court has recently explained the relevant standard of review for such questions as follows:

> Michigan's appellate courts also review a trial court's interpretation and application of the no-fault act de novo. When interpreting and applying a statute, a court's primary goal is to ascertain and give effect to the Legislature's intent. In doing so, courts look first to the language of the statute itself. If the statute is clear and unambiguous, it must be enforced as written, and judicial construction is neither necessary nor permissible. However, Michigan's appellate courts have recognized that "[t]erms contained in the no-fault act are read in the light of its legislative history and in the context of the no-fault act as a whole." Moreover, "[g]iven the remedial nature of the no-fault act, courts must liberally construe its provisions in favor of the persons who are its intended beneficiaries." "Further, courts should not abandon common sense when construing a statute." [*Miclea v Cherokee Ins Co*, 333 Mich App 661, 666-667; 963 NW2d 665 (2020) (citations omitted; alterations in original).]

## III. ANALYSIS

The present appeal focuses on the issue of insurance company priority. "When determining the priority of insurers liable for no-fault PIP benefits, courts must examine MCL 500.3114." *Duckworth v Cherokee Ins Co*, 333 Mich App 202, 210-211; 963 NW2d 610 (2020) (quotation marks and citation omitted). "[T]he general rule is that one looks to a person's own insurer for

no-fault benefits unless one of the statutory exceptions, [MCL 500.3114(2), (3), and (5)], applies." *Miclea v Cherokee Insurance Co*, 333 Mich App 661, 668; 963 NW2d 665 (2020) (alterations in original; quotation marks and citation omitted). The exception at issue in this case is located in MCL 500.3114(3), which provides as follows:

> An employee, his or her spouse, or a relative of either domiciled in the same household, who suffers accidental bodily injury while an occupant of a motor vehicle owned or registered by the employer, shall receive personal protection insurance benefits to which the employee is entitled from the insurer of the furnished vehicle.

"The no-fault act does not expressly define 'employer' or 'employee.' " *Miclea*, 333 Mich App at 669. However, it has been held that an "independent contractor is not considered an 'employee' for purposes of the no-fault act." *Adanalic v Harco Nat Ins Co*, 309 Mich App 173, 191; 870 NW2d 731 (2015). "An independent contractor is one who, carrying on an independent business, contracts to do work without being subject to the right of control by the employer as to the method of work but only as to the result to be accomplished." *Parham v Preferred Risk Mut Ins Co*, 124 Mich App 618, 622-623; 335 NW2d 106 (1983).

More than four decades ago, this Court, in *Parham*, established the economic reality test as the governing analytical framework for determining the employment status of an individual— specifically, whether that individual is to be classified as an employee or an independent contractor—for purposes of MCL 500.3114(3). See *Miclea*, 333 Mich App at 669; *Duckworth,* 333 Mich App at 211. While the economic reality test has been invoked across various sectors of the law, our Supreme Court has emphatically cautioned that "the common-law economic realities test cannot be used to supersede [a] statute[.]" *Janetsky v County of Saginaw*, ___ Mich ___, ___; ___ NW3d ___ (2025) (Docket Nos. 166477 and 166478); slip op at 10-11 (quotation marks and citation omitted; alterations in original). Particularly significant is this Court's recognition in *Parham* that "the exception contained in MCL 500.3114(3) of that act relates more clearly to a 'commercial' setting by insuring predictability and risk allocation." *Parham*, 124 Mich App at 624. Consistent with this rationale, our Supreme Court has further elucidated that judicial interpretations of MCL 500.3114(3) "have given it a broad reading designed to allocate the cost of injuries resulting from use of business vehicles to the business involved through the premiums it pays for insurance." *Celina Mut Ins Co v Lake States Ins Co*, 452 Mich 84, 89; 549 NW2d 834 (1996).

The genesis of the economic reality test lies in the perceived shortcomings of the "control" test, which had historically been utilized to delineate the boundary between employees and independent contractors within the labor and employment law context. In *Tata v Benjamin Muskovitz Plumbing & Heating*, 354 Mich 695, 699; 94 NW2d 71 (1959), our Supreme Court expressly adopted Justice SMITH's dissenting opinion in *Powell v Employment Security Comm*,

345 Mich 455, 462; 75 NW2d 874, (1956) as the governing standard for ascertaining whether an individual qualified as an employee under the worker's compensation statutory scheme.[5]

Justice SMITH, writing in dissent in *Powell*, observed that "it offends my sense of realities . . . to describe such servants of one master, these integral cogs of a larger business machine, as independent contractors, independent businessmen and women," solely on the basis that they are "allegedly free of their employer's 'control.'" *Powell*, 345 Mich at 463-464 (SMITH, J., dissenting). He persuasively contended that the worker in question—a woman compensated on a piece-rate basis for work performed at home and subsequently delivered to her putative employer—should be classified as an employee rather than an independent contractor, as she and others similarly situated were "utterly dependent, *as a matter of economic reality*, upon another, their employer." *Id*. (emphasis added).

Justice SMITH mounted a forceful critique of the "so-called control test" and its transplantation into the realm of social legislation from its origins as an instrument for circumscribing the otherwise expansive doctrine of respondeat superior in tort law. *Id*. at 465-471. At that juncture, the control test functioned as the principal criterion for distinguishing employees from independent contractors, focusing on whether the putative employer retained the right to control the worker, irrespective of whether such control was exercised. *Id*. at 465. Justice SMITH wrote that the "independent contractor, so-called, is a relative newcomer to the law . . . brought into being as a limitation upon the unrestrained application of the doctrine of *respondeat superior*" due to judicial discomfort with imposing liability on those who engaged skilled specialists (e.g., a drover or doctor) for the negligence of those so retained. *Id*. at 467-468. He then articulated the emergent legal principles as follows:

> A servant does his master's bidding, and for his torts the master is liable. But an independent contractor does no master's bidding. He is his own master. He exercises the skills of his calling in his own way. For his torts his employer is not liable unless, of course, the employer has assumed control over him in which case he will be liable as for any other servant controlled. Thus the formula: An independent contractor is one who, carrying on an independent business, contracts to do a piece of work according to his own methods, and without being subject to control by his employer as to the means by which the result is to be accomplished but only as to the "result of the work." [*Id*. at 471 (citation omitted).]

Justice SMITH subsequently articulated his criticisms in terms that speak clearly for themselves:

---

[5] As stated by our Supreme Court in *Janetsky*, ___ Mich at ___ n 3; slip op at 10 n 3, this test has been partially superseded in the worker's compensation context by statutory amendment. However, this does not affect the analysis in the present case involving the no-fault act, which does not statutorily define "employee," and under which the common-law economic reality test is still used. *Miclea*, 333 Mich App at 669.

It is a complete perversion of this principle to employ the control exception (an independent contractor does not remain such if made subject to control) as a test for his status as an independent contractor in the first place. It is much as though we employed the well-known exceptions to the corporate entity doctrine as tests for the existence of the corporation itself. Confusion is inevitable.

All of this, however, has to do with the law of torts, of damage suits. I have written, in previous dissenting opinions, of the inapplicability of a tort concept to the administration of social legislation and I shall not repeat here what was said there. *One of its many difficulties is that this test*, so borrowed from the law of torts, *is capable of producing any result, of rationalizing any fact situation*, depending upon whether we use the word "control" to mean peremptory order, request, command, direction, suggestion, implication, or other shade of meaning in the transmission of will, wish, or desire, whether these elements must be express, or need only be implied, in fact or law, and whether an unexercised "right" as to them is sufficient.

In its actual operation the control test reflects the ambiguities of its meanings. The decisions in this field are in a state of indescribable confusion . . . . The decision[s] cannot be reconciled save upon minute factual differences, which, having once served their purpose of distinction, receives scant attention in succeeding cases.

*But the control test reaches its lowest level of futility when it is employed in those cases in which no control is possible from the very nature of the work*. Under such circumstances although the employer's 'relinquishment' of his right to control has no factual significance whatever, legally it may be regarded as decisive. Thus laborers are employed to empty a carload of coal. The employer insists that he does not control them, that he did not hire their "services" but only contracted for the "result," an empty car. The means of unloading, he says, are their own, i. e., they can shovel right-handed or left-handed, start at one end of the car or the other . . . . Or a typist is employed to type mailing stickers from a list of customers. Again the employer argues that he has no control over the way the work is done, meaning, presumably, that the typist can type the letters of the words she must copy in any order she chooses . . . . The administration of an act designed to relieve human want should not be made to depend upon our resolution of such verbal antics.

The use of this legal chameleon as a "test" is, moreover, an open invitation to statutory evasion . . . .

\* \* \*

This distorted and foreign test, "control," then, lacking definite meaning, lends itself readily both to absurd results and to easy evasion. As a result, as noted, the cases are in a chaotic condition. It is obvious that a test which has so signally failed to achieve either uniformity or certainty is no test in any acceptable sense of the word. I accordingly reject it as such. It is not as clear to me, moreover, as it

seems to Mr. Justice BOYLES, that our Michigan law justifies the application of the control test in the relationship here under examination. The earlier Michigan cases were clear to the point that the unemployment compensation (now employment security) act "furnishes its own test" for the employment relationship and that common-law principles do not control . . . . The test to be used is not expressly stated, as such. It must, as hereafter pointed out, be found in the purposes of the act . . . . The question always remains whether the services were rendered in employment, by a servant, or whether they were rendered in the course of the performance of a contract by an independent businessman. [*Id*. at 471-474 (emphasis added).]

To derive the proper test to use in this context, Justice SMITH first looked to the statutorily expressed purposes of the employment security act and ascertained that the Legislature stated an intention to provide broader coverage for workers beyond merely those who would be considered "employees" under the common law. *Id*. at 476-477. Thus, he reasoned:

Tested by the policies and objectives above enunciated, the confused test of control is largely meaningless. Whether one is controlled in his movements by his employer or not has no relevance to his needs for unemployment compensation. The minutely controlled worker at the elbow of the boss, and the salesman on the road a thousand miles from the plant, each dependent on his job, suffer equally when the business is forced to close its doors. It is clear to me that the degree of control exercised over these 2 men neither reduces nor emphasizes the risk that he will lose his job in bad times or his family's distress subsequent to the economic tragedy. [*Id*. at 477.]

Finally, Justice SMITH concluded that the proper test should focus on whether the individual was an employee as a matter of *economic reality from the standpoint of the worker and the worker's task*:

The test employed is one of economic reality. It looks at the task performed, whether or not it is a part of a larger common task, "a contribution to the accomplishment of a common objective." The test is far from the common-law test of control, since "the act concerns itself with the correction of economic evils through remedies which were unknown at common law." The test, rather, looks at the workmen, to see whether or not their work can be characterized "as a part of the integrated unit of production," and whether "the work done, in its essence, follows the usual path of an employee." In applying such test, control is only one of many factors to be considered. *The ultimate question is whether or not the relationship is of the type to be protected*. This is a matter of fact, not of terminology. The laborer with shovel in hand remains an employee even though the employer, under the spur of tax or other liability, solemnly recites to him a legal jingle: "I no longer control you. Shovel according to your own methods. I hold you responsible only for the ultimate result, a pile of coal. You render me no shoveling services, but you rather sell me a product: a pile of coal from an emptied car." Likewise the typist on her machine undergoes no transformation into an independent business woman because her employer tells her that she can choose

her own methods of working, *i.e.*, type with 2 fingers or 10. [*Id*. at 478-479 (citations omitted; emphasis added).]

Applying those standards, Justice SMITH determined that the worker in that case was "clearly an employee" because "[h]er work, in essence, followed the usual path of an employee," "was an integral part of her employers' business," and "was a contribution to the common objective." *Id*. at 479. He also concluded that even if the "control" test applied, it was "clear that her employers exercised over her all of the control her work demanded." *Id*.

Justice SMITH's primary focus was the doctrine of economic subjugation and control as determinative of employee status, emphasizing the legal framework governing the relationship between employers and workers:

This woman before us depends, for her livelihood upon one employer, whom she serves continuously on a day-by-day basis. She has no established "business" unless we so dignify the sale of her manual dexterity. She has neither shop nor salesroom, unless such we call the kitchen or dining room, where she works. She has no industrial machinery, save her bare hands and the pencil held therein, a light, and the desk at which she works. She does not hold herself out as being in business for herself. We find not in the record before us her business card, a business telephone listing, or an example of a paid advertisement. She has no pay roll, no employees. She does the same work as those who work under the company roof. She is paid the same piecework rate, a dollar a head. She is supervised no differently. She can be fired at will. If this is independence the word has acquired a new meaning, a meaning strange and foreign to our deep-rooted ideas of independence, a meaning with overtones both ominous and subtle. I reject it. [*Id*. at 465-466.]

And again:

It is difficult to imagine a case of more abject economic subjection than that of the industrial homeworker . . . described in detail herein. We find not only all of the control required or permitted by the nature of the work but also the right to fire at any time. As any worker knows, the hand that holds the pay check wields also the whip, of discipline. An error, an infraction of the rules, and the job may be only a memory. To assert "independence" under such circumstances is to make a play on words, reaching a result completely divorced from the realities of life. To say that these forms of control may also be applied to an "independent contractor" is merely to destroy his independence, to demonstrate his integration with the larger economic machine. [*Id*. at 475.]

It was this economic reality test, as proposed by Justice SMITH, that this Court adopted in *Parham* for "determining whether an employer-employee relationship exists" under MCL 500.3114(3). *Parham*, 124 Mich App at 623-624. This Court rejected the application of the "control" test. *Id*. at 624-625. The *Parham* Court stated that the "factors to be considered [under the economic reality test] include: (a) control of the worker's duties, (b) payment of wages, (c) right to hire, fire and discipline, and (d) the performance of the duties as an integral part of the

employer's business towards the accomplishment of a common goal." *Id*. at 623; see also *Adanalic*, 309 Mich App at 191, quoting *Parham*, 124 Mich App at 623.

However, despite the appeal and apparent convenience of distilling the inquiry to a concise list of easily manageable factors, there still is no 'ultimate' test under the 'economic reality' theory. As Mr. Justice SMITH stated in *Schulte v American Box Board Company*, 358 Mich 21, 33; 99 NW2d 367 (1959):

> "This is not a matter of terminology, oral or written, but of the realities of the work performed. Control is a factor, as is payment of wages, hiring and firing, and the responsibility for the maintenance of discipline, but the test of economic reality views these elements as a whole, assigning primacy to no single one." [*Askew v Macomber*, 398 Mich 212, 220; 247 NW2d 288 (1976).]

In *Duckworth*, this Court observed that there was another variation of the economic reality test set forth in *McKissic v Bodine*, 42 Mich App 203, 208-209; 201 NW2d 333 (1972), which had eight factors that had substantial overlap with the four-factor variation. *Duckworth*, 333 Mich App at 212-213. The *McKissic* factors are:

> First, what liability, if any, does the employer incur in the event of the termination of the relationship at will?
>
> Second, is the work being performed an integral part of the employer's business which contributes to the accomplishment of a common objective?
>
> Third, is the position or job of such a nature that the employee primarily depends upon the emolument for payment of his living expenses?
>
> Fourth, does the employee furnish his own equipment and materials?
>
> Fifth, does the individual seeking employment hold himself out to the public as one ready and able to perform tasks of a given nature?
>
> Sixth, is the work or the undertaking in question customarily performed by an individual as an independent contractor?
>
> Seventh, control, although abandoned as an exclusive criterion upon which the relationship can be determined, is a factor to be considered along with payment of wages, maintenance of discipline and the right to engage or discharge employees.
>
> Eighth, weight should be given to those factors which will most favorably effectuate the objectives of the statute. [*Duckworth*, 333 Mich App at 212 (quotation marks and citation omitted).]

This Court in *Duckworth* expressly recognized the heightened relevance of the *McKissic* factors in cases where the employment relationship is contested, specifically regarding the distinction between employee and independent contractor status. This Court further clarified that the *McKissic* factors align with the broader, non-exhaustive considerations articulated in *Adanalic*.

Accordingly, *Duckworth* held that both the *McKissic* and *Adanalic* factors must be weighed when adjudicating employee versus independent contractor status under the Michigan no-fault act. See *Duckworth*, 333 Mich App at 213-214. Importantly, no single factor is dispositive; rather, courts are required to assess the totality of the circumstances when applying the economic reality test. *Id*. at 211-212.

Recent jurisprudence interpreting MCL 500.3114(3) in the context of injured semi-truck drivers provides instructive analysis of the economic reality test. In *Adanalic*, the plaintiff entered into a contractual relationship with DIS Transportation for the purpose of transporting cargo. 309 Mich App at 177. Following an injury sustained during a delivery, a dispute arose concerning priority between the plaintiff's personal no-fault insurer and the insurer of the vehicle provided by DIS. Applying the economic reality test, the Court determined that the plaintiff qualified as an independent contractor rather than an employee of DIS for purposes of MCL 500.3114(3), rendering the plaintiff's personal insurer first in priority. *Id*. at 193-194.

This Court's analysis in *Adanalic* addressed each of the four principal factors. On the issue of control, the Court found DIS exercised minimal oversight: the plaintiff maintained the contractual prerogative to refuse loads, independently determined the method of transport, and was not contractually bound to haul exclusively for DIS. *Id*. at 193. Regarding remuneration, the plaintiff was compensated via commission based on accepted loads, bore responsibility for his own expenses, and managed his own tax obligations, as evidenced by the issuance of 1099 forms and the absence of tax withholdings by DIS. *Id*. Concerning the authority to hire, fire, or discipline, the relationship was terminable at will by either party, and the plaintiff retained the discretion to hire and supervise his own employees, independent of DIS oversight. *Id*. at 194. As to whether the plaintiff's work constituted an integral part of DIS's business, the Court concluded he was not indispensable; DIS contracted with multiple drivers, and the plaintiff retained the freedom to terminate the relationship or decline loads at will. *Id*.

By contrast, in *Duckworth*, this Court concluded that the plaintiff truck driver was an employee of the entity for whom he was transporting cargo for purposes of MCL 500.3114(3). *Duckworth*, 333 Mich App at 219. The plaintiff, injured while operating a semi-truck owned by Speed Express, had entered into a contractual arrangement to haul and deliver freight. *Id*. at 207. In its analysis, this Court applied the economic reality test—including both the *Adanalic* and *McKissic* factors—to determine the employment relationship. *Id*. at 213-214.

Initially, this Court evaluated the four *Adanalic* factors, which substantially overlap with certain *McKissic* factors. *Id*. at 214. With respect to control, the Court found that Speed Express exercised extensive supervision over the plaintiff's work: the plaintiff was required by written agreement to adhere to company guidelines, was mandated to follow designated routes, faced the risk of termination for refusing assignments, and operated a truck and trailer owned by Speed Express. *Id*. at 214-215. The Court concluded that this factor strongly favored employee status. *Id*. at 215. The Court further observed that, although the plaintiff was remunerated on a per-mileage basis—a fact indicative of an independent contractor relationship—he was also paid on a biweekly schedule, more typical of an employer-employee arrangement. *Id*. The issuance of a 1099 form and the requirement that the plaintiff pay his own income taxes weighed toward independent contractor status; however, the Court emphasized that Speed Express's classification

of the plaintiff as a subcontractor was relevant but not controlling. Ultimately, the Court reiterated that no single factor is determinative. *Id*.

This Court addressed the next two factors as follows:

> The third factor concerns Speed Express's right to hire, fire, and discipline plaintiff. The main point is that if the worker can be "fired" without having any legal recourse, i.e., a breach-of-contract claim, then it is likely the worker is an employee, not an independent contractor who would have such rights. See *McKissic*, 42 Mich App at 208 ("[W]hat liability, if any, does the employer incur in the event of the termination of the relationship at will?"). In this case, the agreement does not specify a term of employment or refer to termination. This indicates an at-will employee relationship that could be terminated for any reason. Also, it appears that Speed Express retained the right to discipline plaintiff because the agreement stated that plaintiff was to comply with all "corrective actions and fines outlined in [the Driver Handbook]." Further, plaintiff was required to complete "new hire paperwork" and pass a drug test before he could drive for Speed Express. He also was required to submit to random drug tests as requested. These requirements are all indicative of an employee-employer relationship, and therefore the third factor supports a finding that plaintiff was an employee.
>
> Under the fourth factor, the question is not whether the particular worker is integral to the business but instead whether the type of work is integral to the business . . . . Indeed, the second *McKissic* factor makes clear that the focus is on the work, not the worker: "[I]s the work being performed an integral part of the employer's business which contributes to the accomplishment of a common objective?" *McKissic*, 42 Mich App at 208 (emphasis added). Here, Speed Express was operating a trucking business. Plaintiff's work as a truck driver was therefore integral to the business. [*Id*. at 215-216 (alterations in original).]

The Court further determined that the third, fourth, and fifth *McKissic* factors supported the existence of an employee-employer relationship. Specifically, the plaintiff depended exclusively on his employment with Speed Express to satisfy his living expenses, did not furnish his own equipment or materials, and did not otherwise present himself to the public as an available truck driver. See i*d*. at 216.

With respect to the sixth *McKissic* factor, the Court observed that the record was devoid of evidence establishing whether the nature of the work in question is customarily performed by independent contractors or employees, and reiterated that an employer's unilateral characterization of the relationship lacks dispositive effect. *Id*. at 216 n 7.

Regarding the eighth *McKissic* factor, the Court held that the purposes underlying MCL 500.3114(3) would be best served by classifying the plaintiff as an employee, thereby rendering the insurer of the semi-truck first in priority. The Court reasoned that Speed Express's insurer had assumed the risks attendant to the company's trucking operations, and that imposing liability on the business vehicle's insurer advances the Legislature's intent to prioritize that insurer over the personal insurer of the operator when the business vehicle is involved in an accident. *Id*. at 216–

17. Accordingly, the *Duckworth Court* concluded that application of the economic-reality test and its relevant factors established the existence of an employee-employer relationship. The Court distinguished *Adanalic*, noting the materially diminished degree of control that DIS exercised over the truck driver's duties in that case. *Id*. at 218–19.

In applying the economic reality framework here, we recognize that no singular or dispositive test governs the economic reality analysis; rather, the focus rests upon the substantive realities of the work performed, as opposed to mere labels or terminology. See *Askew*, 398 Mich at 220. The enumerated factors are to be considered collectively and in context, with the overarching inquiry being *whether the relationship is of the type intended to be protected by the relevant statutory scheme.* See *Powell*, 345 Mich at 479 (SMITH, J., dissenting). The analysis thus demands consideration of the totality of the circumstances and any factors pertinent to the particular case. See *Duckworth*, 333 Mich App at 212.

As mentioned, precedent involving truck drivers reveals the inherent ambiguity in determining whether "the work or the undertaking in question is customarily performed by an individual as an independent contractor." *Id*. at 212 (quoting *McKissic*, 42 Mich App at 208–09). The present record is devoid of evidence illuminating this inquiry. As Justice SMITH aptly noted, while the distinction between employee and independent contractor is clear "at the extremes," there exists a significant cohort of individuals "working in the twilight zone of employment, where, either by deft surgery or due to the structure of the modern business machine, certain elements of common-law, elbow-to-elbow 'control' have been removed." *Powell*, 345 Mich at 467 (SMITH, J., dissenting).

Even assuming, as appears likely from this case and analogous cases involving truck drivers, that it is a common practice to issue 1099 forms to truck drivers for tax purposes, such practice merely reflects the company's own characterization of the employment relationship and is not dispositive. *Duckworth*, 333 Mich App at 215. This is but another example of the "legal jingle" by which employers may attempt to recast employees as independent contractors; however, such characterizations, standing alone, do not alter the fundamental nature of the relationship for purposes of statutory analysis. *Powell*, 345 Mich at 479 (SMITH, J., dissenting). Furthermore, "one may be an employee for the purposes of certain legislation but not for the purposes of another aimed at a different mischief." *Id*. at 466. Hence, the fact that an individual may be regarded as an independent contractor for tax purposes does not control the determination of employee status under Michigan's no-fault act.

With respect to the method of compensation, plaintiff received weekly payments based on the trips completed, with the quantum of payment varying by destination but not by mileage. Plaintiff received a 1099 form, and Transport Systems did not withhold taxes on his behalf. Compensation was remitted through plaintiff's brother's company, Gorgis Trucking, which then paid plaintiff directly. Plaintiff was not provided health insurance or workers' compensation benefits by Transport Systems. These arrangements appear calculated to create the semblance of an independent contractor relationship.

The more salient aspect of plaintiff's compensation is that he was remunerated solely by Transport Systems, for whom he exclusively hauled cargo. Plaintiff testified that he worked six

days per week for Transport Systems and did not believe he could have worked for any other company, even if technically permitted, due to the demands of his schedule and workload. Thus, plaintiff did not have multiple clients or companies to which he provided truck driving services but instead rendered continuous services for a single entity in exchange for compensation. However the payments were structured, this arrangement more closely aligns with an employee-employer relationship than that of an independent contractor. See *Powell*, 345 Mich at 465 (SMITH, J., dissenting).

Quintessential independent contractors are "persons following a regular, independent employment, in the course of which they offer their services to the public, accepting orders and executing commissions for all who may employ them in a certain line of duty, using their own means for the purpose, and being accountable only for final performance." *Id*. at 468–69 (quotation marks and citation omitted). The factual record in this case does not support a finding that plaintiff falls within this paradigm.

With regard to whether the position was of such a nature that plaintiff was primarily dependent upon it for his livelihood, the record reveals that, while plaintiff possessed supplemental income from a rental property, the substantial time commitment—approximately six days per week—devoted to truck driving indicates that this employment constituted his principal source of income. Plaintiff further testified that, notwithstanding any theoretical ability to accept similar work from other entities, the demands of his schedule rendered such external engagements impracticable. The existence of ancillary income from an unrelated source does not detract from the conclusion that plaintiff's truck driving constituted his primary occupation. The record thus supports a finding that plaintiff was wholly dependent on Transport Systems for the income derived from his central professional pursuit. *Id*.

The subsequent factor concerns the rights to hire, fire, and discipline. Plaintiff responded to an advertisement and applied for employment with Transport Systems, subsequently undergoing an orientation prior to commencing work. No written contract governed the employment relationship. Plaintiff believed he retained the ability to resign at will. Upon seeking to return to Transport Systems, plaintiff was informed that his services were no longer required. Plaintiff further testified that he was presented with a document to sign in connection with his termination, which he declined to execute, and that his termination was precipitated by a second incident involving a deer. Transport Systems sought to impose the cost of truck repairs on plaintiff, which he refused. Plaintiff had not previously been subject to formal discipline. These facts collectively point to an at-will, terminable relationship, and the record does not reflect any likelihood that Transport Systems would incur liability upon dissolution of the relationship. This factor weighs in favor of an employee-employer relationship.

With respect to the degree of control exercised over plaintiff's duties, the evidence demonstrates that plaintiff received assignments from a dispatcher, who offered specific driving jobs that plaintiff could theoretically accept or decline. Nonetheless, plaintiff's testimony reveals that he experienced implicit pressure not to decline assignments with frequency. Although not subject to a fixed schedule, plaintiff generally worked six days per week and did not engage in driving for other companies. Upon accepting a load, plaintiff was provided a specific time for pickup but retained discretion regarding route selection and personal breaks. No comprehensive

handbook or general written guidance was furnished, though specific instructions were provided for individual assignments. The financial arrangement required plaintiff and Transport Systems to equally divide fuel costs, while plaintiff was responsible for half the costs associated with weigh stations, highway taxes, and tolls. Plaintiff bore no responsibility for vehicle repairs. No uniforms were mandated, nor was any particular attire required.

While plaintiff possessed a measure of discretion in the performance of his duties, such discretion is consistent with the inherent nature of the work and does not equate to the autonomy characteristic of an independent contractor. See *Powell*, 345 Mich at 472 (SMITH, J., dissenting). Transport Systems prescribed the times and locations for load pickups and established the final destinations. Plaintiff was compensated on a per-load basis, thereby incentivizing prompt and efficient delivery within the regulatory constraints governing hours of service and required breaks. The ability to select routes and schedule personal breaks does not constitute meaningful independence, as such choices are incidental to the execution of the assigned tasks. Although plaintiff could theoretically refuse assignments, there existed an implicit expectation to accept work regularly, with practical consequences for frequent refusals. The freedom to decline work, coupled with the concomitant risk of termination, is a feature common to at-will employment and does not, in itself, establish independent contractor status. Thus, the record reflects only limited discretion, insufficient to undermine an employment relationship.

Even accepting that Transport Systems did not furnish plaintiff with detailed, express instructions—either orally or in writing—regarding the methodology for completing deliveries, the structure of compensation and task delegation was nonetheless carefully calibrated to promote conduct in furtherance of Transport Systems' business objectives. Plaintiff was thus subject to a degree of control congruent with the economic realities of the relationship. This factor, too, supports a finding of employee status.

Determining whether a worker's duties constitute an integral component of an employer's business enterprise is a nuanced inquiry guided by precedent and the specific facts of the case. This Court's decisions in *Adanalic* and *Duckworth* illustrate the complexity of this factor within the economic reality test. In *Adanalic*, the Court focused on the presence of multiple drivers under contract and the plaintiff's ability to resign at will, concluding that these circumstances undermined the notion that the plaintiff's work was indispensable to the employer's profit-driven aims. See *Adanalic*, 309 Mich App at 194. However, the *Duckworth* Court viewed the question through a different lens, emphasizing that a transportation company's core business necessarily depends on its drivers' labor. *Duckworth*, 333 Mich App at 216.

Upon careful consideration of the record before us, it is manifest that Transport Systems' business purpose—namely, the commercial transport of cargo—cannot be achieved without the services of its truck drivers. The evidence demonstrates that plaintiff was one among several drivers employed by Transport Systems and that the company's ongoing operations were fundamentally reliant upon this cadre of drivers to carry out its essential activities. Indeed, the plaintiff's testimony regarding interactions with other drivers and the company's response to his accident further support this conclusion.

While the ability to resign and the existence of multiple drivers are relevant considerations, these factors do not negate the reality that the substance of plaintiff's work was central to the company's commercial objective. Courts must remain attentive to the distinction between peripheral and core functions; in the context of a transportation company, the operation of trucks by qualified drivers is not ancillary, but foundational. Thus, weighing all circumstances, we conclude that the plaintiff's duties were integral to Transport Systems' business, and this factor strongly favors a finding of an employee-employer relationship. *Id*.

With respect to the provision of equipment and materials, the evidentiary record demonstrates that this obligation was shared by plaintiff and Transport Systems. At the time of the incident, plaintiff utilized his personal cell phone, for which he bore the full cost and received no reimbursement. While Transport Systems did not supply plaintiff with a phone or subsidize its expense, it did mandate the installation and use of the "Keep Trucking" application on plaintiff's device for the maintenance of required driving logs. The truck and trailers utilized by plaintiff were owned by Transport Systems or its principals. Plaintiff consistently operated the same truck, though the trailers varied by assignment. Given that the core function of plaintiff's position was the operation of trucks to transport cargo, it is manifest that Transport Systems supplied the essential equipment necessary for the performance of plaintiff's duties. This factor supports the classification of plaintiff as an employee.

This Court has recognized that preeminent weight must be afforded to those factors which most effectively advance the objectives of the pertinent statutory scheme. *Duckworth*, 333 Mich App at 212. As Justice SMITH articulated, the "ultimate question is whether or not the relationship is of the type to be protected." *Powell*, 345 Mich at 479 (SMITH, J., dissenting). Both this Court and the Michigan Supreme Court have clarified that MCL 500.3114(3) embodies a legislative intent to allocate the costs associated with injuries arising from the use of business vehicles to the business itself, through the insurance premiums it pays. *Celina*, 452 Mich at 89; see also *Duckworth*, 333 Mich App at 217 n 8 (noting that in a priority dispute, the Legislature intended for the employer's insurer, rather than the employee's personal insurer, to bear liability for accidents involving the business vehicle).

At the time of the incident, plaintiff operated a truck owned and supplied by Transport Systems, performing cargo deliveries at the direction of the company. Plaintiff devoted six days per week to interstate deliveries for Transport Systems, adhering to schedules and pickup locations established by the employer, and was incentivized financially to maximize efficiency and frequency of deliveries. Minor variations in the degree of autonomy exercised by different truck drivers with respect to nonessential aspects of job performance do not bear upon the determination of insurance priority under MCL 500.3114(3). Considering the totality of the circumstances, the economic reality is that plaintiff functioned as an employee of Transport Systems. Accordingly, Carolina, as the insurer of the vehicle operated by plaintiff, holds first priority under MCL 500.3114(3).

Carolina's reliance on the so-called "Independent Contractor Waiver of Coverage" does not warrant a contrary result. At the outset, it must be emphasized that the waiver in question is principally relevant to the issue of workers' compensation benefits, and does not, standing alone, determine the nature of the working relationship for all legal purposes. The established law is

-17-

clear: while parties may enter into agreements purporting to define their relationship as one of independent contractor, such agreements are not controlling. Rather, the existence of such a document is merely one of several factors that courts must consider in determining employment status. See *Buckley v Prof Plaza Clinic Corp*, 281 Mich App 224, 234; 761 NW2d 284 (2008). The weight to be accorded these self-styled designations is necessarily limited, as they are often prepared by the employer and may reflect the employer's unilateral interests rather than the actual dynamics of the working relationship. In particular, an employer's presentation of a form characterizing a worker as an independent contractor is inherently self-serving, and courts must be vigilant not to elevate form over substance. As explained above, notwithstanding Transport Systems' efforts to label plaintiff as an independent contractor, the economic reality test—applied in light of the totality of the circumstances—demonstrates that plaintiff was, in fact, an employee. This conclusion is compelled not by the parties' formalistic labels, but by the objective facts and the legal framework governing employment relationships.

Having determined that plaintiff qualifies as an employee of Transport Systems, it is unnecessary for this Court to resolve the alternative argument advanced by AAA regarding whether Carolina would retain priority in the event plaintiff was deemed an independent contractor. The resolution of the employment status issue renders the remaining priority argument moot for purposes of this appeal.

Accordingly, we reverse the judgment of the trial court and remand this matter for the entry of an order granting summary disposition in favor of AAA. We do not retain jurisdiction. Appellants having prevailed in full are entitled to costs. MCR 7.219(A).

/s/ Stephen L. Borrello
/s/ Adrienne N. Young
/s/ Christopher M. Trebilcock